**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **JOHN ELMY, individually and on behalf of all other similarly situated persons,** | |
| **Plaintiffs,** | **Case No.** |
| **v.** | **COLLECTIVE AND CLASS ACTION COMPLAINT** |
| **WESTERN EXPRESS, INC., NEW HORIZONS LEASING, INC., and JOHN DOES 1-5,** | |
| **Defendants.** | |

## COLLECTIVE & CLASS ACTION COMPLAINT

1.      Plaintiff John Elmy, individually and on behalf of all other similarly situated persons, by and through undersigned counsel, hereby complain as follows against Defendants Western Express, Inc. ("Western"), New Horizons Leasing, Inc. ("New Horizons"), and John Does 1-5 (collectively "Defendants").

## INTRODUCTION

2.      Defendants Western and New Horizons are private companies, owned and operated by the same people, including Paul Wieck and Richard Prickett, for a common business purpose, i.e. moving freight interstate for customers of Western.

3.      Plaintiffs are current and former long-haul truck drivers who are lured into a scheme by which:

   a.   Defendants induce Plaintiffs into becoming so-called "Owner Operators"[1] by
        misrepresenting material facts about the Owner Operator program including how

---

[1] While Defendants refer to drivers who they lease trucks to as "Owner Operators," these drivers do not actually own the trucks and thus will also be referred to in this Complaint more accurately as "lease operators."

1

much money they will earn;

b. Defendants require Plaintiffs to sign an unconscionable Equipment Lease ("Lease") and Contract Hauling Agreement ("Contract"), referred to herein collectively as "Agreements," on a "take-it-or-leave-it" basis to become lease operators;

c. Defendants will lease trucks to Plaintiffs for exclusive re-lease back to Western;

d. Defendants treat Plaintiff lease operators as independent contractors, even though Defendants will exert control over every aspect of Plaintiffs' work;

e. Plaintiffs cannot drive their leased truck for any other company;

f. Plaintiffs bear virtually all expenses required to deliver Defendants' freight; and

g. Defendants coerce Plaintiffs to continue driving trucks for the Defendants for long periods at a time under threat of crushing financial debt and fear that they will lose the ability to work in the trucking industry again should they leave their employment with Defendants.

4.     This case seeks redress under Tennessee common law for fraud and negligent misrepresentation for Defendants' scheme to misrepresent material facts about the Owner Operator program in order to induce Plaintiffs to become Owner Operators.

5.     This case also seeks redress under the unconscionability provisions of the Tennessee Uniform Commercial Code, Tenn. Code Ann. §§ 47-2-302 and 47-2A-108, for the unconscionable Lease and Contract that Defendants require Plaintiffs to sign on a "take-it-or-leave-it" basis to become lease operators. The terms of the Lease and Contract are so one-sided that Plaintiffs are denied any opportunity for meaningful choice.

6.     This case also seeks redress under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* for Defendants' failure to pay Plaintiffs minimum wages through misclassification of Plaintiff

2

lease operators as "independent contractors" when by law they are employees.

7.     This case also seeks redress under Tennessee common law for unjust enrichment for Plaintiffs conferral of a benefit upon Defendants by acting as employees but being misclassified as independent contractors. Plaintiffs performed the primary business in which Defendants are engaged and were controlled by Defendants but had to bear employment-related expenses and were not subject to federal and state protections for employees.

8.     This case also seeks redress under the Federal Forced Labor statute, 29 U.S.C. § 1589, and under the Tennessee Involuntary Labor Servitude statute, Tenn. Code Ann. §§ 39-13-307 and 39-13-307, for Defendants' scheme to tie the lease operators treated as independent contractors to labor for Defendants for long periods of time under threat of serious financial harm.

**JURISDICTION AND VENUE**

9.     Jurisdiction is conferred upon this Court by 29 U.S.C. § 216(b) of the Fair Labor Standards Act, by 28 U.S.C. § 1331, this action arising under laws of the United States, by 28 U.S.C. § 1332(d) of the Class Action Fairness Act, and by 28 U.S.C. § 1337, this action arising under Acts of Congress regulating commerce. Jurisdiction over Plaintiffs' claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

10.    Plaintiffs' claims involve matters of national or interstate interest.

11.    The matter in controversy in the aggregate exceeds the sum or value of $5,000,000 exclusive of interests and costs.

12.    Members of the proposed Class are citizens of States different from the Defendants.

13.    Named Plaintiff Elmy is a citizen of Georgia.

14.    Upon information and belief, members of the proposed Class are citizens of all 50 states

and the District of Columbia.

15.     Defendants are citizens of Tennessee, Nevada and Iowa.

16.     Defendants conduct business in this District. Defendants are headquartered within the Middle District of Tennessee. Defendants' main terminal (out of seven terminals in the United States) is located in Nashville, Tennessee, within the Middle District of Tennessee. Defendant employs terminal managers and dispatchers in the Middle District of Tennessee. Defendant maintains facilities in the Middle District of Tennessee at which lease operators can have repairs and maintenance performed on their trucks, park their trucks, and park their trailers for swapping out loads.

17.     Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and at least one Defendant resides in this District.

## PARTIES

**A.      Plaintiffs**

18.     Plaintiff John Elmy is a natural person residing in Martinez, Georgia. Plaintiff Elmy leased a truck from Defendants and signed Defendants' form Agreements. As a matter of law, Plaintiff Elmy was an employee of Defendants as described herein. Plaintiff Elmy worked for Defendants in Tennessee and other states.

19.     Plaintiff was engaged in commerce in his work for Defendants.

20.     Plaintiff Elmy brings claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, individually and on behalf of a collective action class as further described herein.

21.     Plaintiff Elmy also brings claims under Tennessee common law for fraud and negligent misrepresentation, under the unconscionability provisions of the Tennessee Uniform Commercial Code, Tenn. Code Ann. §§ 47-2-302 and 47-2A-108, under Tennessee common law for unjust

4

enrichment, under the Federal Forced Labor statute, 29 U.S.C. §§ 1589 and 1595, and under the Tennessee Involuntary Labor Servitude statute, Tenn. Code Ann. §§ 39-13-307 and 39-13-307, individually and on behalf of a nationwide Class, under Fed. R. Civ. P. Rule 23, as further described herein.

**B.      The FLSA Collective Action Class**

22.      The term "Plaintiff" or "Plaintiffs" as used in this Complaint refers to the Named Plaintiff and any additional represented Collective Action Class Members pursuant to the collective action provision of 29 U.S.C. § 216(b). The Named Plaintiff brings this case under the collective action provision of the FLSA as set forth in 29 U.S.C. § 216(b) on behalf of themselves and a class of persons throughout the U.S. consisting of "all truckers who lease a truck from New Horizons Leasing, Inc. to drive for Western Express, Inc. during the three years preceding the filing of the initial complaint and up through the date of final judgment herein and subject to any equitable tolling for any applicable portion of the limitation period."

23.      Excluded from any Collective Action Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in any Defendants.

**C.      The Rule 23 Class**

24.      The Second through Sixth Causes of Action are properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3). There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members of the Class and that will  be resolved by common answers including but not limited to:

     a.   Whether Defendants are or were Plaintiffs' employers;

     b.   Whether Defendants intentionally misrepresented material facts about the Owner

5

Operator program to mislead drivers into becoming Owner Operators;

c.  Whether Defendants recklessly represented material facts about the Owner Operator program without knowing whether they were true;

d.  Whether Defendants failed to exercise reasonable care or competence in obtaining or communicating information about the Owner Operator program to drivers;

e.  Whether Plaintiff lease operators conferred a benefit upon Defendants by acting as Defendants' de facto employees while being classified by Defendants as independent contractors;

f.  Whether Defendants were aware of such benefit;

g.  Whether Defendants' acceptance of such benefit under the circumstances would be inequitable for them to retain the benefit without payment of the value thereof;

h.  Whether the terms of the Agreements Plaintiffs had to sign to become lease operators were so unequal as to shock the judgement of a person of common sense;

i.  Whether the provisions of the Agreements Plaintiffs had to sign to become lease operators were so one-sided, in view of all the facts and circumstances, that Plaintiffs were denied any opportunity for meaningful choice;

j.  Whether Defendants knowingly obtained Plaintiffs' labor by means of threats of serious financial and reputational harm;

k.  The nature and extent of Class-wide injury and the appropriate measure of damages for the Class.

25.  The claims of Plaintiff are typical of the claims of the Class he seeks to represent. Plaintiff and the Class members work or have worked for Defendants and have been subjected to a common policy, practice and scheme that:

a. Induces Plaintiffs to become Owner Operators by misrepresenting material facts about the Owner Operator program;

b. Requires Plaintiffs to sign an unconscionable Lease and Contract on a "take-it-or-leave-it" basis;

c. Unjustly enriches Defendants by allowing them to control Plaintiffs like employees while shifting all risk and expenses onto Plaintiffs and depriving them of federal and state protections for employees;

d. Forces Plaintiffs to work for Defendants for long periods of time under threat of serious financial and reputation harm.

26. Defendants acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief with respect to the Class appropriate.

27. Plaintiff will fairly and adequately represent and protect the interests of the Class.

e. Plaintiff understands that, as class representative, he assumes a fiduciary responsibility to the Class to represent its interests fairly and adequately.

f. Plaintiff recognizes that as class representative, he must represent and consider the interests of the Class just as he would represent and consider his own interests.

g. Plaintiff understands that in decisions regarding the conduct of the litigation and its possible settlement, he must not favor his own interests over those of the Class.

h. Plaintiff recognizes that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Class.

i. Plaintiff understands that to provide adequate representation, he must remain informed of developments in the litigation, cooperate with class counsel by providing them with information and any relevant documentary material in his possession, and

7

testify, if required, in a deposition and in trial.

28.     Plaintiff has retained counsel competent and experienced in complex class action employment litigation.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation - particularly in the context of wage litigation like the present action, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against one of the larger truckload carriers in the United States. The members of the Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

**D.      Defendants**

30.     Upon information and belief, Defendants Western and New Horizons are related business corporations having an office and place of business in Tennessee.

31.     Defendant Western is a privately owned Nevada corporation with its principal office address at 7135 Centennial Place, Nashville, TN 37209.

32.     Defendant Western is a motor carrier, engaged in interstate shipment of freight.

33.     Defendant New Horizons is a privately owned Iowa corporation with its principal address at 7135 Centennial Place, Nashville, TN 37209.

34.     Defendant New Horizons has an office and place of business at the very same location as Western.

35.     Defendant New Horizons is related to Western. It leases trucks to truckers who will drive for Western. It requires truckers who sign Leases to sign Contracts with Western.

36.     Defendant New Horizons leases trucks to Western lease operators for the purpose of

helping Western further its shipping business.

37.     Upon information and belief, Defendants Western and New Horizons are owned and operated by same people, including Paul Wieck and Richard Prickett.

38.     Upon information and belief, Defendants Western and New Horizons have other interlocking and overlapping officers and directors.

39.     Defendants John Doe 1 through John Doe 5 are presently unknown persons who, directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices of Defendants Western and New Horizons which resulted in Defendants' failing to pay Plaintiffs proper compensation pursuant to the FLSA and Tennessee state laws.

40.     John Does 1-5 are jointly and individually liable for Defendant Western's failure to compensate Plaintiffs at least the federal minimum wage for all hours worked because they directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices which violated the FLSA.

41.     Defendants Western and New Horizons conduct business throughout the country.

42.     Upon information and belief, Defendants Western and New Horizons each grossed more than $500,000 in each of the last three calendar years, individually and collectively.

43.     Defendants Western and New Horizons are enterprises engaged in interstate commerce for purposes of the Fair Labor Standards Act.

44.     Defendants Western and New Horizons have common control and a common business purpose and are operated as a single enterprise, within the meaning of 29 U.S.C. § 203(r)(1).

45.     All actions and omissions described in this complaint were made by Defendants directly or through their supervisory employees and agents.

# FACTUAL BACKGROUND

## A.     Fraud and Misrepresentation That Owner Operators Would Earn Over $225,000 Annually

46.     Through Western's website, Defendants have regularly and repeatedly misrepresented to drivers that they will earn over $225,000 annually. On its "Owner Operator" page, Defendants' website states "CDL Truck Driver; $225,000+ Annually; Upgrade To Independence!"

47.     Defendants make similar promises through other electronic communications. For example, Western posts ads to Facebook representing how much money lease operators will earn and how many miles they will drive.

48.     Immediately prior to signing the Contract and Lease, Western makes representations to potential lease operators about the Owner Operator program including, but not limited to, that they can take home time whenever they want, that they will get their choice of loads, that they will be given the best loads, and that Western will keep them moving.

49.     Western also represents that the lease is a "walk-away" lease and that there will be no consequences for terminating the lease early.

50.     Defendants make such misrepresentations knowing they are false or make such misrepresentations recklessly, knowing that there is insufficient knowledge upon which to base such a representation, or make such misrepresentations without exercising reasonable care or competence in communicating the information to potential Owner Operators.

51.     Defendants make such misrepresentations to drivers in order to deceive them and induce them to become Owner Operators because Owner Operators are more profitable to Defendants than company drivers. As opposed to company drivers, Defendants can then shift virtually all of their business expenses and business risk to the Owner Operators; coerce Owner Operators into remaining with Western for long periods of time under threat of serious financial harm, and

10

avoid compliance with federal and state protections for employees, such as Title VII, FMLA, NLRA and wage protection statutes such as the FLSA and similar state laws.

52. By misclassifying Owner Operators, Defendants also avoid paying payroll taxes, such as Social Security, FUTA, etc., on the wages the Owner Operators earn and shift their tax burdens obligations onto Owner Operators.

53. Drivers, including Plaintiff, reasonably and justifiably relied on these representations by Defendants, having no reason to know that such representations were false, and signed Leases and Contracts with Defendants to become Owner Operators.

54. Upon information and belief, the vast majority of lease operators, including Plaintiff did not earn $225,000 annually. In many weeks they earned less than the minimum wage and negative balances in weeks when they expenses exceeded their earnings. Upon information and belief, average earnings for owner operators are far less than $225,000 annually. Upon information and belief, Defendants possess all financial data necessary to know that its representations concerning earnings are false.

55. Plaintiff lease operators suffered damages and financial losses including, among other things, loss of wages due to Defendants' failure to pay lease operators $225,000 annually, as a result of their reliance on Defendants' false representations and their subsequent action of becoming lease operators.

**B.      Procedural and Substantive Unconscionability of the Lease and Employment Contract**

56. Western and New Horizons present the Plaintiff lease operators with an integrated series of pre-printed forms, the Equipment Lease ("Lease") and Contract Hauling Agreement ("Contract"), referred to herein collectively as "Agreements," to lease Plaintiffs trucks owned by Defendants and purporting to create an independent contractor relationship.

11

57. Western and New Horizons provide the Agreements on a "take-it-or-leave-it" basis that must be signed at the time they are provided to the Plaintiffs.

58. Plaintiffs who signed a Lease with New Horizons were required to simultaneously sign a Contract with Western. The New Horizons Lease and Western Contract are part of a package that drivers are required to sign in toto to become Owner Operators.

59. Lease operators are not provided with a hard copy of the Lease and Contract, but instead are sent an electronic copy to their cell phones. Lease operators are made to sign the Lease and Contract "then and there" on Defendants' premises. Only once they have signed the Lease and Contract are they given a hard copy of the documents.

60. In many cases, lease operators are made to review the Agreements at locations far from their home, with no practical way home, other than by signing the Agreements in order to lease the truck as a means of transportation.

61. Defendants forbid Plaintiffs to drive their leased trucks for any other trucking companies, yet Defendants do not guarantee any amount of work to Plaintiffs.

62. The Contracts allow Western to terminate lease operators' Contracts, with or without cause, on 10 days' written notice.

63. Upon information and belief, Western regularly terminates lease operators' Contracts without 10 days' written notice.

64. The Contract requires Plaintiffs to arbitrate all disputes arising out of the Contract, but reserves for Defendants the right to seek redress in a judicial forum for various claims they might have against Plaintiffs.

65. The New Horizons Lease requires that lease operators sign a contract with Western and authorize Western to deduct and pay New Horizons any amounts due to New Horizons from

lease operators' pay.

66. The New Horizons Leases allows New Horizons to treat a lease operator as in "default" of the lease for numerous reasons including if (a) he or she does not make a lease payment when due; (b) the lease operator breaches any provision of the lease (including not having a Contract with Western/driving for another company) or any agreement between the lease operator and any affiliate of New Horizons (including the Contract with Western); (c) the lease operator ceases to business as a going concern; or (d) the lease operator carries a negative settlement balance with New Horizons for more than 10 days.

67. If a lease operator is put in "default" by New Horizons, Defendants take possession of the truck, thereby depriving lease operators of their means of livelihood, and claim "liquidated damages" under a provision that guarantees all remaining Lease payments (which can be a hundred thousand dollars or more). This is so even though Defendants' own unilateral conduct of terminating the Contract or depriving lease operators of loads may have caused the "default." The Lease allows for liquidated damages despite the fact that any actual losses to New Horizons are capable of determination and mitigation through re-leasing the truck, and that any losses are far less than Defendants unreasonable liquidated damages. Even more onerous to the lease operators is that, in addition to liquidated damages, the Lease provides for acceleration of all remaining Lease payments upon default.

68. This allows Western to exercise almost complete over lease operators because if lease operators do not comply with Western's demands, Western can simply terminate the Contract or refuse to give lease operators loads, forcing them into default with New Horizons, and the subsequent crushing financial consequences.

69. Although the Agreements allow for lease operators to terminate these Contracts, lease

13

operators are not free to do so, because lease operators would be deemed in "default" of their Leases, leading to the same severe financial and reputational consequences for lease operators as if Defendants had terminated the Agreements.

70.     Furthermore, if Defendants characterize a lease operator as in "default" for any reason, Defendants report lease operators' amounts due to credit reporting agencies (thereby impeding lease operators' ability to work for other carriers) and report lease operators' "default" to HireRight for inclusion on the lease operators' "Drive-A-Check" ("DAC") report, an employment history report that the trucking industry uses to make hiring decisions (thus seriously impeding or denying their ability to obtain future employment).

71.     The Lease and Contract are unconscionable because, among other things, they are presented to Plaintiffs on a "take-it-or-leave-it basis" with no opportunity for Plaintiffs to negotiate any of their terms, and because they purport to allow Defendants to: (a) employ Plaintiffs but classify them as independent contractors; (b) terminate the Lease and Contract at will, with all penalties flowing to Plaintiffs; (c) immediately charge Plaintiffs for all remaining lease payments upon what is termed a "default" by Plaintiffs, even though the decision to end the Lease and Contract is made by Defendants; and (d) unilaterally force Plaintiffs to arbitrator their claims against Defendants but preserve the right of Defendants to sue Plaintiffs in court.

## C.     Misclassification of Plaintiff Lease Operators as Independent Contractors/ Minimum Wage Violations

72.     Despite the characterization of lease operators as independent contractors, Western exercises virtually the same control over lease operators as it does over its employee drivers.

73.     The Defendants' characterization of Western's employee workforce as independent contractors  is the centerpiece of a labor scheme crafted to allow Western to charge its lease operators for the opportunity to work, shift virtually all of its business expenses and business risk

14

to its lease operators, coerce lease operators into remaining with Western for long periods at a time under threat of serious financial harm; defeat all federal and state protections for employees, such as Title VII, FMLA, NLRA and wage protection statutes such as the FLSA and similar state laws. By misclassifying lease operators, Defendants also evade their obligation to pay payroll taxes such as Social Security and FUTA and shift tax burdens onto the Plaintiff lease operators.

74.     Although there is language in Defendants' Contract that appears to permit Plaintiffs to work for other trucking companies, in fact, Defendants' Lease provides that Plaintiffs must have a Contract with Western Express.

75.     The Agreements also implicitly provide that a lease operator cannot haul freight for another carrier without terminating the Agreements with Defendants. The Contract states that a lease operator must remove all Western identification and documentation from the leased truck before hauling for another carrier, or Defendant Western can withhold the lease operator's final settlement, implying that once a lease operator hauls for another carrier, he no longer hauls for Defendant Western and is given his final settlement. The Lease also requires lease operators to have a contract with the Carrier reflected in Schedule A of the Lease (in Plaintiffs' case, that Carrier is Defendants Western). Failure to maintain such a contract is a default under the Lease.

76.     In addition, when signing the Agreements, Defendants repeatedly verbally emphasize that Plaintiffs cannot take the truck to another carrier.

77.     Defendants do not warranty the trucks that they lease to Plaintiffs and do not guarantee Plaintiffs any amount of work.

78.     Defendants jointly control Plaintiffs' work and, by law, employ Plaintiffs to transport goods by truck for Western's customers. Defendants control and monitor when, where, and how Plaintiffs deliver freight. They assign loads one at a time to Plaintiffs, who must accept the load

assignment or face punishment. Defendants also control and monitor the equipment that Plaintiffs use, including, its operation, maintenance, and condition. Defendants control the number and type of loads that are offered to Plaintiffs, thereby controlling how much money they can make. Defendants attach a "speed governor" to the trucks they lease to Plaintiffs, so that Western even monitors and controls the speed at which Plaintiffs may drive. Defendants monitor and control virtually every aspect of Plaintiffs' performance of Western's work and the equipment that Plaintiffs use for that work.

79.    Even though Defendants act as Plaintiffs' employers by law, Defendants benefit greatly by misclassifying Plaintiffs as independent contractors. Plaintiffs fund Defendants' fleet inventory. Defendants charge Plaintiffs tens of thousands of dollars per year for the lease of Defendants' trucks, and they also require Plaintiffs to pay for other equipment, gas, tolls, insurance, bonding, repairs and maintenance, among other items. Defendants charge Plaintiffs directly for a wide variety of employer expenses including the truck being used for Defendants' business purpose, the Qualcomm device by which Defendants send instructions to Plaintiffs, monthly Qualcomm administrative fees, liability insurance, (indemnifying Western and New Horizons), taxes, tolls, equipment, gas, truck maintenance, and a variety of other charges incurred for Defendants' benefit.

80.    Thus, while the Contract purports to permit Plaintiffs to be independent contractors, Plaintiffs are compelled to work only for Western during the terms of their contracts, doing the primary work that Western performs in the market – hauling of goods for Western's customers.

81.    By the Agreements, Defendants force Plaintiffs to bear Defendants' business expenses. Defendants require Plaintiffs to pay for the truck being used for Defendants' business purpose, the Qualcomm device by which Defendants send instructions to Plaintiffs, monthly Qualcomm

16

administrative fees, liability insurance, (indemnifying Western and New Horizons), taxes, tolls, equipment, gas, truck maintenance, and a variety of other charges, including those designed solely to cover Defendants' administrative expenses and Defendants' profit.

82. Defendants (or agents arranged by Defendants) handle the administration of taxes, licensure, registration, bonding, insurance, tolls, gas, and accounting related to Plaintiffs' trucks, for Defendants' own protection, but pass along all these costs (generally with a markup for profit) to the Plaintiffs.

83. Plaintiffs are required to pay money to Defendants for a security deposit account. Under the Contract, Defendants are authorized to deduct from the account the various expenses that they have shifted to Plaintiffs in the event that Plaintiffs do not pay them, including for vehicle licenses, insurance, loss or damage to cargo, personal injury or property damage, parts or service, administrative costs, taxes, failure to properly or timely deliver freight, Qualcomm leasing, loss or damage to Western-owned trucks, and fines or penalties.

84. Defendants' scheme as described herein shifts virtually all of the costs of maintaining Western's fleet and general business operations to Plaintiffs, but keeps all the benefits. This scheme also shifts the risk of a downturn in the trucking business from Defendants to Plaintiffs, since Defendants are not obligated to give Plaintiffs any specific amount of work.

85. Western fails to pay the wages required by law free and clear to the Plaintiff employees.

86. Instead, Western calculates the pay for Plaintiffs by a weekly accounting that makes deductions from the mileage pay due to Plaintiffs for the various business expenses it and New Horizons shifts to Plaintiffs. Additionally, Plaintiffs are made to bear Defendants' business expenses out of their own pockets. Such expenses constitute *de facto* deductions from Plaintiffs' pay.

87. In many weeks, the deductions from Plaintiffs' pay yield wages well below federal minimum wage guarantees. In many weeks lease operators have negative balances, i.e., they owe Defendants more in expenses than Defendants pay them. Thus, Defendants failed to pay Plaintiff the minimum wage for each hour worked.

**D.    Unjust Enrichment of Defendants by Plaintiff Due to Employee Misclassification**

88. Lease operators conferred a benefit on Defendants by acting as employees, but being misclassified as independent contractors, as they fulfilled the primary business in which Defendants engage and were controlled by Defendants but had to bear employment-related expenses and were not subject to all federal and state protections for employees. Defendants knew of these benefits. Nevertheless, they misclassified lease operators so they could avoid their obligations to lease operators as employees and shift the expenses of Defendants business onto those employees. By accepting the services of these employees but misclassifying them as independent contractors, Defendants caused lease operators to lose wages, incur negative settlements, and suffer other damages. Such circumstances make it inequitable for Defendants to retain the benefits of lease operators' employment without paying them for the value of such employment conferred.

89. The Contract between Owners Operators and Defendants is unenforceable for many reasons including, among other things, unconscionability. Thus, lease operators, including Plaintiff, do not have an adequate remedy at law and are entitled to the equitable remedy of unjust enrichment.

90. By misclassifying Plaintiff lease operators as independent contractors, Defendants obtain a vast competitive advantage over competitor trucking companies that treat their lease operators as employees in compliance with the law. Defendants' pay practices drive down trucker wages

across the industry and undercut fair labor practices across the country.

**E.     Forced Labor/Involuntary Labor Servitude of Plaintiffs Under Threat of Financial Harm**

91.     Defendants force Plaintiffs to labor for them for long periods of time, under terms that employees would never be bound to follow. The Lease states that, among other things, if the lease operator does not make a lease payment when due, breaches any provision of the Lease or Contract, or carries a negative settlement balance for more than 10 days, Defendants will treat the lease operator as in "default." Upon a "default" Defendants may repossess the leased truck, accelerate all remaining lease payments, thereby imposing crushing debt on the lease operator, ruin the lease operator's credit rating, and file a negative entry on the Plaintiff lease operator's "DAC Report" which is universally used in the trucking industry as a pre-employment screening tool, thereby making it virtually impossible to obtain work as a truck driver again. Defendants may also proceed by court action to enforce performance of the Lease or recover any damages for breach of the lease, though lease operators are forced to arbitrate any disputes.

92.     Under the Lease, Defendants can also recover as liquidated damages all expenses of retaking, holding, preparing for sale, and selling the truck. Defendants can also recover as liquidated damages attorney's fees and other legal expenses.

93.     Even though Plaintiffs are tied to working for the Defendants for long periods of time, Western reserves the right to terminate its Contract with Plaintiffs at any time it chooses, which is contractually defined as a "default" of New Horizons's Lease by the lease operators. Upon characterizing the Defendants' acts as a lease operator's default, Defendants immediately repossess the truck and also accelerate the remaining Lease payments and New Horizons's lost profits which become immediately due and owing. Since a lease for a new truck can cost a Plaintiff over $100,000, Defendants have the unilateral power to subject Plaintiffs to crushing

financial consequences, for any reason or for no reason at all.

94.     Thus, upon termination of the Contract, Defendants claim they may reap windfall profits, further penalize Plaintiffs, and even prevent Plaintiffs from earning a living using the leased truck – the essential tool of Plaintiffs' trade -- while concurrently demanding excessive and unreasonable liquidated damages upon "default."

95.     Defendants' ability to put Plaintiffs in default of the Lease at any time provides Defendants with further means to maintain exclusive control over the lease operators' work, and forces lease operators to accept changes to the Contract or Lease imposed unilaterally by Defendants and to work for less than the minimum wage.

96.     Thus, even though the Contract provides that either party may terminate the Contract, Plaintiffs cannot reasonably do so, because to do so also would trigger a "default" of the Lease resulting in the same severe financial penalties as if Defendant had terminated the Contract.

97.     Plaintiffs are thereby forced to endure working under Defendants' exclusive control for leases lasting as long as three years, even when they are being paid sub-minimum wages, while Defendants on the other hand, may fire Plaintiffs at any time, while calling that termination a "default" by the lease operator, and even exact further profits from doing so.

98.     Defendants' scheme is designed to force the continued labor of Plaintiffs by using threats of serious financial and professional harm through explicit threats to impose, enforce, and collect significant debts, prohibit Plaintiffs from pursuing their profession by submitting negative entries on their DAC trucker employment report (so that other trucking companies will not hire them), and to report the "default" to credit bureaus so the lease operator's credit is destroyed and he or she will not be able to become a lease operator with another trucking company.

**F.     Individual Plaintiff Facts**

20

99.     Plaintiff Elmy began working for Western as a company driver in 2011. He worked for Western as a company driver for approximately two years and then left Western to drive for another company as a company driver.

100.    In 2016, Plaintiff Elmy saw a Facebook advertisement for Western's Owner Operator program. The advertisement made representations about how much money he would make and how many miles he would run as an Owner Operator.

101.    Relying on those representations, Plaintiff Elmy applied for the program. He was notified by Western that he was approved and was sent a one-way bus ticket to Nashville, Tennessee.

102.    At that time, a friend of Plaintiff Elmy told him that he was also interested in being a lease operator for Western Express so the two of them decided to run as a team.

103.    When Plaintiff Elmy arrived at Western's headquarters, he was taken into a room with other potential lease operators where an employee of Western made representations to them about the Owner Operator program including, but not limited to, that he could take home time whenever he wanted, that he would get his choice of loads, that Owner Operators were given the best loads, and that Western would keep him moving.

104.    Prior to signing a Lease and Contract, Defendants told Plaintiff that he could walk away from the Lease at any time without consequence.

105.    Plaintiff Elmy relied on Western's representations about the Owner Operator program in deciding to sign a Lease and Contract.

106.    In reliance upon Western's representations, Plaintiff Elmy signed a Lease and Contract on or about February 12, 2016.

107.    Though Plaintiff Elmy and his friend wanted to drive as a team, Western required one person to sign the Contract and Lease and "hire" the other person as a co-driver. Western had to

21

approve the co-driver. Plaintiff Elmy and his friend decided that Plaintiff Elmy would sign the Contract and Lease and "hire" his friend.

108.    Defendants sent Plaintiff Elmy the Lease and Contract on his cell phone, and Plaintiff Elmy signed the Lease and Contract through his cell phone.

109.    Plaintiff Elmy requested a paper copy of the Lease and Contract and was told that he would get a paper copy only after he signed them. Plaintiff Elmy was not provided with a paper copy of the Lease and Contract until after he signed them.

110.    Plaintiff Elmy was not allowed to negotiate any of the terms of the Lease or Contract, including who to lease the truck from. Plaintiff Elmy was required to lease a truck from New Horizons. Defendants told Plaintiff Elmy that he had to sign the documents immediately.

111.    Plaintiff Elmy did not make $225,000 annually as a lease operator.

112.    In some weeks for work, Plaintiff Elmy did not make any earnings at all, and was treated by Defendants as owing them money for the work he performed for their benefit.

113.    Defendants told Plaintiff Elmy that he had to accept all loads assigned to him or it would be deemed a service failure, which is a basis for terminating the contract.

114.    Plaintiff Elmy was never given a choice of loads, but was instead assigned a single load at a time that he was required to accept.

115.    Defendants told Plaintiff Elmy that he could not use his leased truck to haul loads for other carriers.

## G.    Defendants' Actions Were Willful and Defendants' Unlawful Practices Were Widespread

116.    Defendants' failure to pay Plaintiffs the proper wages required by law was willful.

117.    Defendants' unlawful conduct, as set forth in this Class Action Complaint, has been intentional, willful, and in bad faith, and has caused significant damages to Plaintiffs and the

22

Class.

118.     Defendants were aware or should have been aware that the law required them to pay Plaintiffs and the Plaintiff Class members minimum wages for each workweek.

119.     Upon information and belief, Defendants apply the same unlawful policies and practices to the Plaintiffs in every state in which they operate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (FEDERAL FAIR LABOR STANDARDS ACT)

120.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs

121.     Defendants failed to pay minimum wages to Plaintiffs in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. and its implementing regulations.

122.     Defendants' failure to pay proper minimum wages for each hour worked per week was willful within the meaning of the FLSA.

123.     Defendants' failure to comply with the FLSA minimum wage protections caused Plaintiffs to suffer loss of wages and interest thereon.

### SECOND CAUSE OF ACTION
### (TENNESSEE COMMON LAW FRAUD)

124.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

125.     Defendants engaged in fraud in that (1) Defendants made a representation of a present or past fact; (2) the representation was false when it was made; (3) the representation involved a material fact; (4) Defendants either knew that the representation was false or did not believe it to be true or that Defendants made the representation recklessly without knowing whether it was true or false; (5) Plaintiffs did not know that the representation was false when made and were

23

justified in relying on the truth of the representation; and (6) Plaintiffs sustained damages as a result of the representation.

126.     Plaintiffs acted reasonably and in ignorance of the falsity of Defendants' representations, and were thereby induced to act to their injury and damage.

127.     Defendants' fraud caused Plaintiffs to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

## THIRD CAUSE OF ACTION
## (TENNESSEE COMMON LAW NEGLIGENT MISREPRESENTATION)

128.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

129.     Defendants engaged in negligent representation by, in the course of their business, profession, or employment, or in any other transaction in which they had a pecuniary interest, supplying false information for the guidance of Plaintiffs in their business transactions, and by failing to exercise reasonable care or competence in obtaining or communicating the information to Plaintiffs.

130.     Defendants are subject to liability for pecuniary losses caused to Plaintiffs by Plaintiffs' justifiable reliance on the representations.

131.     Defendants' negligent misrepresentation caused Plaintiffs to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

## FOURTH CAUSE OF ACTION
## (TENNESSEE UNIFORM COMMERCIAL CODE LEASE AND CONTRACT
## UNCONSCIONABILITY)

132.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding

24

paragraphs.

133.    The Lease and Contract are unconscionable and thus unenforceable under the Tennessee Uniform Commercial Code, Tenn. Code Ann. §§ 47-2-302 and 74-2A-108, as the provisions of the Agreements are so one-sided, in view of all the facts and circumstances, that Plaintiffs were denied any opportunity for meaningful choice.

134.    The Lease and Contract are unconscionable because, among other things, they are presented to Plaintiffs on a "take-it-or-leave-it basis" with no opportunity for Plaintiffs to negotiate any of their terms, and because they purport to allow Defendants to:  (a) employ Plaintiffs but classify them as independent contractors; (b) terminate the Lease and Contract at will, with all penalties flowing to Plaintiffs; (c) immediately charge Plaintiffs for all remaining lease payments upon what is termed a "default" by Plaintiffs, even though the decision to end the Lease and Contract is made by Defendants; and (d) unilaterally force Plaintiffs to arbitrator their claims against Defendants but preserve the right of Defendants to sue Plaintiffs in court.

135.    Defendants' unconscionable Leases and Contracts caused Plaintiffs to suffer damages, including but not limited to, loss of wages and interest thereon, and the assuming of debt and expense obligations inherent in the Defendants' Owner Operator program.

## FIFTH CAUSE OF ACTION
## (TENNESSEE COMMON LAW UNJUST ENRICHMENT)

136.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

137.    Defendants were unjustly enriched by Plaintiffs as (1) Plaintiffs conferred benefits on Defendants; (2) Defendants appreciated such benefits; and (3) Defendants' accepted and retained such benefits under such circumstances as to make it inequitable for Defendants to retain the benefits without payment of their value.

25

138. Defendants' unjust enrichment caused Plaintiff to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

139. Plaintiffs are entitled to restitution of all benefits conferred upon Defendants, including but not limited to, the disgorgement of any unjust profits.

### SIXTH CAUSE OF ACTION
### (FEDERAL FORCED LABOR)

140. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

141. Defendants obtained the continuous labor of Plaintiffs by using threats of serious financial and professional harm.

142. Defendants operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious financial and professional harm.

143. Defendants threatened Plaintiffs that they would use the legal system, debt collection system, and DAC Reports to enforce the crushing debt that defendants' Lease and Contract operation imposed on Plaintiffs.

144. Defendants' scheme, plan or pattern caused Plaintiffs to engage in forced labor for Defendants in violation of the federal forced labor statutes, 18 U.S.C. §§ 1589 and 1595.

### SEVENTH CAUSE OF ACTION
### (TENNESSEE INVOLUNTARY LABOR SERVITUDE)

145. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

146. Defendants obtained the involuntary labor servitude of Plaintiffs by using threats of serious financial and professional harm.

147.    Defendants operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious financial and professional harm.

148.    Defendants threatened Plaintiffs that they would use the legal system, debt collection system, and DAC Reports to enforce the crushing debt that defendants' Lease and Contract operation imposed on Plaintiffs.

149.    Defendants' scheme, plan or pattern caused Plaintiffs to engage in involuntary labor servitude for Defendants in violation of the Tennessee Involuntary Labor Servitude statute, Tenn. Code Ann. §§ 39-13-307 and 39-13-307.

**WHEREFORE**, Plaintiffs request that this Court enter an Order:

1.    With respect to the FLSA claims:

    a.    Approving this action as a collective action and directing that Notice be issued to all Class Members;

    b.    Declaring that Defendants violated the FLSA;

    c.    Declaring that Defendants' violations of the FLSA were willful;

    d.    Granting judgment to Plaintiffs and represented parties for their claims of unpaid wages as secured by the Fair Labor Standards Act, as well as an equal amount in liquidated damages and interest;

    e.    Awarding Plaintiffs and represented parties reasonable service awards; and

    f.    Awarding Plaintiffs and represented parties their reasonable attorneys' fees and costs of suit including expert fees and interest.

2.    With respect to the fraud and negligent misrepresentation claims:

    a.    Certifying this action as a class action;

    b.    Designating Plaintiff as Class Representative;

c. Designating the undersigned counsel as Class Counsel;

d. Declaring that Defendants engaged in fraud and negligent misrepresentation;

e. Granting judgment to Plaintiffs for their damages;

f. Granting judgment to Plaintiff for punitive damages against Defendants;

g. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

h. Awarding Plaintiff his reasonable attorneys' fees and costs of suit including expert fees and interest.

3. With respect to the Uniform Commercial Code unconscionability claims:

a. Certifying this action as a class action;

b. Designating Plaintiff as Class Representative;

c. Designating the undersigned counsel as Class Counsel;

d. Declaring that the Lease and Contract are unconscionable;

e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order determining that the Contract is void, or voidable, or alternatively severing any unconscionable clauses and enjoining Defendants from continuing their unlawful practices as described herein;

f. Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

g. Awarding pre-judgment and post-judgment interest, as provided by law;

h. Granting such other legal and equitable relief as the Court may deem just

and proper;

    i.   Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

    j.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

4.    With respect to the unjust enrichment claims:

    a.   Certifying this action as a class action;

    b.   Designating Plaintiff as Class Representative;

    c.   Designating the undersigned counsel as Class Counsel;

    d.   Awarding damages and restitution, including disgorgement of Defendants' profits;

    e.   Awarding pre-judgment and post-judgment interest, as provided by law;

    f.   Granting such other legal and equitable relief as the Court may deem just and proper;

    g.   Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

    h.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

5.    With respect to the forced labor claims:

    a.   Certifying this action as a class action;

    b.   Designating Plaintiff as Class Representative;

    c.   Designating the undersigned counsel as Class Counsel;

    d.   Entering a declaratory judgment that the practices complained of herein

are unlawful;

e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices as described herein;

f. Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

g. Awarding pre-judgment and post-judgment interest, as provided by law;

h. Granting such other legal and equitable relief as the Court may deem just and proper;

i. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j. Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

6. With respect to the involuntary servitude claims:

a. Certifying this action as a class action;

b. Designating Plaintiff as Class Representative;

c. Designating the undersigned counsel as Class Counsel;

d. Entering a declaratory judgment that the practices complained of herein are unlawful;

e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices as

described herein;

f.   Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

g.   Awarding pre-judgment and post-judgment interest, as provided by law;

h.   Granting such other legal and equitable relief as the Court may deem just and proper;

i.   Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

Dated: August 24, 2017

Respectfully Submitted,

Lesley Tse (*pro hac vice* pending)
Michael J.D. Sweeney (*pro hac vice* pending)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, New York 12401
Telephone: (845) 255-9370
Fax: (845) 255-8649
Email: ltse@getmansweeney.com

Justin L. Swidler, Esq. (PA #205954)
(pro hac vice motion to be filed)
Swartz Swidler, LLC
1101 Kings Hwy N., Ste 402
Cherry Hill, NJ 08034
Tel: (856) 685-7420
Fax: (856) 685-7417
Email: jswidler@swartz-legal.com

31

Charles Yezbak
Yezbak Law Offices
2002 Richard Jones Rd., Suite B-200
Nashville, Tennessee 37215
Telephone: (615) 250-2000
Email: yezbak@yezbaklaw.com

ATTORNEYS FOR PLAINTIFFS