# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| JOHN ELMY, individually and on behalf of all other similarly situated persons,<br><br>                **Plaintiffs,**<br><br>v.<br><br>Western EXPRESS, INC. and NEW HORIZONS LEASING, INC., JOHN DOES 1-5,<br><br>                **Defendants.** | **CIVIL NO. 3:17-cv-01199**<br><br>**JUDGE CRENSHAW**<br>**MAGISTRATE FRENSLEY** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

Respectfully Submitted,

*/s/ Lesley Tse*

Lesley Tse (*pro hac vice*)
Michael J.D. Sweeney (*pro hac vice*)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, New York 12401
Telephone: (845) 255-9370
Fax: (845) 255-8649
Email: ltse@getmansweeney.com

Justin L. Swidler, Esq. (*pro hac vice*)
Swartz Swidler, LLC
1101 Kings Hwy N., Ste 402
Cherry Hill, NJ 08034
Tel: (856) 685-7420
Fax: (856) 685-7417
Email: jswidler@swartz-legal.com

ATTORNEYS FOR PLAINTIFFS

## INTRODUCTION

Defendants' motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA") should be denied. Because Plaintiffs' arbitration agreement is part of a contract of employment exempt from arbitration pursuant to § 1 of the FAA, this Court has no power to compel arbitration under that Act. Even if the FAA applied to the arbitration agreement, it cannot be enforced for three distinct reasons: First, the waiver on class and consolidated actions (and on collective actions if the Court interprets the clause to prohibit them)[1] contained in the arbitration provision violate both the Fair Labor Standards Act ("FLSA") and the National Labor Relations Act ("NLRA") and are therefore unenforceable. *See Killion v. KeHE Distribs.*, LLC, 761 F.3d 574, 592 (6th Cir. 2014) (holding that an employee may not prospectively waive his or her rights to bring a collective action pursuant to the FLSA); *NLRB v. Alternative Entertainment, Inc.*, 858 F.3d 393 (6th Cir. 2017) (holding that "an arbitration provision requiring employees covered by the NLRA individually to arbitrate all employment-related claims is not enforceable."). Second, other provisions of the agreement also violate federal law, including the provision that unless claims are brought within one-year they are deemed waived, the provision that the parties split the costs of arbitration, and the waiver of Plaintiff's right to be awarded attorneys' fees. Third, the delegation clause in the agreement is unconscionable as it imposes prohibitive costs on Plaintiff. As a result, this Court has jurisdiction to rule on Plaintiff's challenges to the unconscionability of the arbitration provision itself, including its lack of mutuality of obligation and unconscionable limits on discovery.

## STATEMENT OF THE CASE AND PENDING MOTION

Plaintiff is an interstate truck driver. Defendant Western Express Transportation Co., Inc.

---

[1] Plaintiff does not believe that the class and consolidated waiver bars collective actions pursuant to the Fair Labor Standards Act for the reasons set forth in Section V below. However, if the Court interprets the arbitration provision to bar collective actions, such waiver is also unlawful.

1

("Western"), a truckload carrier, and Defendant New Horizons Leasing, Inc. ("New Horizons"), an equipment leasing company, are interrelated privately held companies owned and operated by the same people, including Paul Wieck and Richard Prickett, for the common business purpose of moving freight interstate for Western's customers. (Defendants are collectively referred to herein as "Western" and Plaintiff, and others similarly situated, are referred to as "Drivers.")

Plaintiff alleges that Western crafted a circular scheme in which it leased trucks to Plaintiff and other similarly situated Drivers for little or no money down and simultaneously required those Drivers to lease the trucks back to Western and use them to haul freight for Western as so-called "owner operators."[2] Count One of the Complaint, Doc. 1, alleges that Plaintiff and other similarly situated Drivers were employees of Western and that Western violated the FLSA by failing to pay them the statutorily mandated minimum wage. Counts Two and Three allege that Western misrepresented material facts about the lease operator program in order to induce the Drivers to become lease operators. Count Four alleges that the Drivers' contracts and leases were unconscionable. Count Five alleges that Western was unjustly enriched by misclassifying the Drivers as independent contractors while actually treating them as employees. Finally, Counts Seven and Eight allege that Western violated Tennessee and federal forced labor statutes.

Western responded to the complaint by filing the instant Motion to Compel Arbitration and Stay or Dismiss This Case. For the reasons set forth below that motion should be denied.

## STATEMENT OF FACTS RELEVANT TO THE MOTION

Plaintiff worked for Western as a lease operator from February 2016 until February 2017. Doc 25 at 4. In order to become a lease operator, Western presents Drivers with two pre-printed form

---

[2] The term "owner operator" is a misnomer as these drivers lease rather than own the trucks they drive. Accordingly, they are referred to interchangeably as "lease operators" herein.

2

documents, a lease agreement ("Lease") with Defendant New Horizons and a Contract Hauling Agreement ("Contract") with Defendant Western. *See e.g.*, Docs. 25-5 and 25-6 (Lease and Contract of Plaintiff John Elmy signed on February 12, 2016)[3]. These two documents are presented as a single package which Drivers must sign on a take it or leave it basis. Declaration of Juan DeJesus ("*DeJesus Decl.*") ¶¶ 7, 7; Declaration of John Elmy ("*Elmy Decl.*") ¶¶ 7, 10; Declaration of William McCullough ("*McCullough Decl.*") ¶¶ 6, 9; Declaration of Benjamin Noonan ("*Noonan Decl.*") ¶¶ 3, 6; Declaration of James Riggs ("*Riggs Decl.*") ¶¶ 7, 10.[4] The Lease allows a Driver to obtain a truck from New Horizons with no money down and the Contract then obligates the Driver to use the truck under Western's operating authority to transport freight for Western. Contract ¶¶ 1, 5.E, 6.

Western and New Horizons are closely-related, privately held corporations owned and operated by the same people and located at the same corporate headquarters in Nashville, TN. As far as Drivers are aware, New Horizons had no separate existence from Western: Drivers are recruited to sign the two documents by Western Express and the documents are presented to Drivers at Western's main terminal in Nashville. *DeJesus Decl.* ¶ 10; *Elmy Decl.* ¶ 14; *McCullough Decl.* ¶ 12; *Noonan Decl.* ¶ 9; *Riggs Decl.* ¶ 13. In many instances, agents of Western Express sign the Lease on behalf of New Horizons. For example, Plaintiff Elmy's Lease is signed by Erik Morrison, *see* Lease, who is the Director of Maintenance for Western Express, *see* Ex. A.

Western does not require a credit check or proof of a Driver's financial responsibility to sign the Contract and Lease, though the Contract and Lease impose heavy financial obligations on

---

[3] Throughout this brief, the Elmy Lease and Contract will be referenced. Plaintiff alleges that all putative collective and class members signed similar Leases and Contracts. *DeJesus Decl.* ¶ 5; *Elmy Decl.* ¶ 8; *McCullough Decl.* ¶ 7; *Noonan Decl.* ¶ 4; *Riggs Decl.* ¶ 8.

[4] These declarations will be filed under seal.

3

Drivers. Ex. B (Western Express website, Lease section; "No credit check. No money down."); *DeJesus Decl.* ¶ 11; *Elmy Decl.* ¶ 15; *McCullough Decl.* ¶ 13*; Riggs Decl.* ¶ 14; Doc. 25-3 (Elmy application to become lease operator). In addition to the weekly lease payment which runs in the hundreds of dollars, ($673/week for Plaintiff. Lease Schedule A), the Contract and Lease impose on the Driver all costs and expenses associated with insuring, operating and maintaining the truck, including rent, fuel, scale tickets, repairs, fines and penalties, licenses, permits, taxes, any costs of loading or unloading freight, costs of Department of Transportation (DOT) drug testing, business liability insurance, Workers' Compensation insurance and the cost of any shortage of, loss of or damage to cargo. Contract ¶¶ 5.A., 5.E., 7.B., 7.D, 7E, 7M, 8, 10, 11, 22; Lease ¶ 12. Like the company store of old that funneled workers' incomes back to the company[5], Western finances the entire leasing process and, once on the road, the Contract allows lease operators to obtain fuel, other operating expenses, and insurance on Western's credit. Contract ¶¶ 4, 12. Such advances are subsequently deducted from the Driver's weekly settlement along with the weekly lease payment, Contract ¶¶ 2, 4, 14, Schedule II, even when such deductions bring Drivers' weekly settlements below the minimum wage or even into a negative balance. Lease ¶ 6 ("…Lessee's obligation to pay the Rental Payments… hereunder shall be absolute and unconditional under all circumstances, regardless of… (ii) any interruption in or cessation of Lessee's use or possession of the Equipment for any reason whatsoever."). If a Driver fails to earn enough each week to cover the lease payment and operating advances provided by Western his Lease is automatically put in default, Lease ¶ 18 ("An event of default shall occur if (a) any Rental Payment… is not paid promptly when due…"), which has the effect of accelerating all remaining lease payments. Lease ¶ 19.

---

[5] *See* Wikipedia, *Company store*, https://en.wikipedia.org/wiki/Company_store (last visited 11/7/17).

4

Not only are the Lease and the Contract presented to Drivers as a package, but they operate together as a single document. No Driver can sign the Lease without signing the Contract as is made clear in paragraph 23 of the Lease.[6] Moreover, the Driver is required to authorize Western Express to deduct the lease payment and any additional charges from the Driver's earnings and remit the money to New Horizons on the Driver's behalf. Lease Exhibit 1.

The Contract gives Western the power to terminate the Contract with or without cause (*see* Contract ¶ 25, "This Contract… may be terminated by either party by giving ten (10) days written notice…) and termination of the Contract is automatically a "default" of the Lease. Lease ¶ 18 ("An event of default shall occur if… (b) Lessee breaches any warranty or provision hereof or of any other instrument or agreement delivered by Lessee to Lessor or to any affiliate of Lessor…"). Thus, Western has the power place a Driver in default of his Lease at will. The default remedies specified in the Lease are draconian, including the right to seize the truck *and* demand full and immediate payment of all remaining lease payments through the end of the lease as well as payment of various other charges. Lease ¶ 19.

The Contract gives Western complete discretion over the number and kinds of loads assigned to a Driver and requires Drivers to accept whatever loads is assigned. Contract ¶ 2. Western also unilaterally sets the rate per mile that Drivers will be compensated for their work. Contract ¶ 2 and Schedule 1. Drivers are fully integrated into Western's transport business, receiving load assignments, one load at a time, and pick-up and delivery times and directions directly from Western, and using Western's trailers, in exactly the same way that Western's

---

[6] Paragraph 23 states: "As additional security for this Agreement, the Lessee will pledge a contract with the Carrier reflected on Schedule 'A' to secure Lease payments to the Lessor." Schedule A identifies the "Carrier" as "Western Express, Inc."

5

employee drivers.[7] *DeJesus Decl.* ¶ 14; *Elmy Decl.* ¶ 18; *McCullough Decl.* ¶ 16*; Noonan Decl.* ¶ 13; *Riggs Decl.* ¶ 17. Like employee drivers, lease operators and their trucks are constantly monitored by Western throughout the day. *DeJesus Decl.* ¶ 18; *Elmy Decl.* ¶ 22; *McCullough Decl.* ¶ 20*; Noonan Decl.* ¶ 17; *Riggs Decl.* ¶ 20. Both kinds of drivers are expected to pick up and deliver their loads on time and assure customer satisfaction. Contract ¶ 7.J. The Contract allows Western to reassign lease operators' loads to other drivers or seize an operator's truck to complete deliveries that Western, in its sole discretion, believes have not been properly or timely delivered. Contract ¶ 16. Although the contract allows Drivers to choose their own routes, that is meaningless since, for the most part, there is only one cost effective route that will ensure the timely delivery required by Western. *See* Contract ¶ 7.J (Drivers must "[e]xercis[e] all diligent efforts to… complet[e] deliveries on time…").

The Contract requires Drivers to pay for and maintain a mobile communication device, acceptable to Western, that Western uses to monitor its Drivers. Contract ¶ 7.I. Under the Contract, Drivers must permit Western to display its advertising on the leased trucks. Contract ¶ 15. While the Contract permits Drivers to hire helpers, all co-drivers must be pre-approved by Western and must comply with the terms of the Contract between the primary Driver and Western. Contract ¶¶ 5.C, 6. Western dictates the maintenance schedule for Drivers' trucks, Lease ¶ 8, and requires Drivers to maintain a $10,000 Maintenance Reserve Account from which Drivers must pay for all maintenance work over $250 through vendors pre-approved by Defendants, Lease ¶ 9. Drivers

---

[7] Western utilizes both lease operators and drivers that it admits are employees. The only material difference between the two is that lease operators are paid a higher mileage rate (from which their lease and operating expenses are deducted) while employee drivers are paid a lower mileage rate (with Western paying for the truck and operating expenses). *DeJesus Decl.* ¶ 12; *Elmy Decl.* ¶¶ 16-17; *McCullough Decl.* ¶¶ 14-15*; Riggs Decl.* ¶¶ 15-16. This is essentially a book-keeping distinction since the pay actually received by both lease operators and employee drivers represents their post-operating cost earnings.

cannot alter or modify the trucks without Defendants' prior written approval. Lease ¶ 14.

While the Contract ¶ 5.E states that Drivers may haul for other carriers, ¶ 5.F makes clear that doing so results in termination of the Contract.[8] Consistent with this provision, Western repeatedly told Drivers that they were not permitted to drive for other carriers.[9] *DeJesus Decl.* ¶¶ 31-32; *Elmy Decl.* ¶ 31; *McCullough Decl.* ¶¶ 31-32; *Riggs Decl.* ¶¶ 29-30.

The Contract contains a very lengthy arbitration provision that, among other things, waives class and consolidated action arbitration, imposes a one year statute of limitations on claims, waives Plaintiff's right to claim statutory attorneys' fees if he prevails, requires Plaintiff to pay half of the costs of arbitration and adopts arbitration rules that severely limit discovery. It also lacks mutuality as it allows Western to pursue its claims in court:

> Any dispute arising out of or relating to the terms or implementation of this Agreement, including any allegation of breach thereof or of violations of 49 C.F.R. Part 376 or other federal, state, or local statutory, regulatory, or common law, shall be fully and finally resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). A demand for arbitration shall be filed with the AAA's office located in or closest to CARRIER's principal place of business, and the arbitration shall be held in Tennessee, or as otherwise agreed to between the parties. The demand shall be filed no later than one (1) year after the dispute arises or the claim occurs. Failure to file the demand within the one-year period shall be deemed a full waiver of the claim. The parties agree that no consolidated or class arbitration shall be conducted. If a court or arbitrator decides for any reason not to enforce this ban on consolidated or class arbitration, the parties agree that this Section 24, in its entirety, shall be null and void, and any disputes between the parties shall be resolved by court action in the State of Tennessee, not arbitration. Both parties agree to be fully and finally bound by the arbitration award, and, where allowed by law, a judgment may be entered on the award in any court having jurisdiction thereof. The parties shall share any AAA

---

[8] Paragraph 5F states that before driving for another carrier, a Driver must remove any and all identification and documentation pertaining to Western. It then states that Western "may withhold final settlement to [the Driver] until [the Driver] has returned such identification or a written letter certifying their removal . . ." The term "final settlement" is used in the Contract to mean the final payment after termination of the Contract. Contract ¶ 4.

[9] While driving for another carrier gives Western the right to terminate the Contract and the Lease, if Western chooses not to, the Driver is required to pay Western 40% of the gross revenue earned for each load hauled for another carrier. Contract ¶ 5.E.

or arbitrator fees and expenses equally, but shall otherwise be responsible for their own respective arbitration expenses, including attorneys' fees unless attorneys' fees are otherwise provided for in this Agreement. This Agreement shall be deemed to have been drafted in accordance with the laws of the United States and of the State of Tennessee and, in the event of any disagreement or litigation, the laws of the United States and of such State shall apply. Notwithstanding the mandatory arbitration provision above, CARRIER may, at its sole discretion, pursue a civil lawsuit against CONTRACTOR and Contractor consent to jurisdiction in any court of competent jurisdiction in the state of Tennessee in order: (1) to recover any property or equipment belonging to CARRIER or its customer seeking injunctive relief, without necessity of posting bond, and to seek damages related to CONTRACTOR's failure to timely return such property or equipment; (2) to recover any advances, or other sums due from Contractor as described in paragraph 4 of this agreement, of any kind from the CARRIER; and (3) to recover its attorney's fees, costs and expenses incurred in such civil lawsuit whether outside council or in-house council is used.

Contract ¶ 24.

## ARGUMENT

## I. STANDARD OF REVIEW

Section 4 of the FAA provides that upon the filing of a petition to compel arbitration,

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect or refusal to perform same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.

9 U.S.C. § 4. Courts generally use a summary judgment standard to determine whether an arbitration agreement covered by the FAA 'has been made' and grant a motion to compel arbitration *only* if the party opposing the motion fails to raise a "genuine issue of material fact as to the validity of the agreement to arbitrate."[10] *Smith v. Servicemaster*, No. 3:09-0250, 2009 WL 1457143, at *4 (M.D.

---

[10] It is important to stress that § 4 requires the Court to find not only that an agreement to arbitrate was made but that it is an agreement to arbitrate covered by the FAA. The various sections of the

8

Tenn. May 22, 2009) ("As interpreted by the Sixth Circuit, Section 4 of the FAA dictates that a party's motion to enforce an arbitration agreement is to be treated similarly to a motion for summary judgment…"), *citing Mazera v. Varsity Ford Management Servs.*, 2009 WL 1375887, \*3 (6th Cir. May 19, 2009). In carrying out its § 4 function, the court must use an analysis "that mirrors the summary judgment analysis standard; that is, the court will view all facts and inferences drawn therefrom in the light most favorable to the non-moving party and will determine whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Id. citing Green Earth Companies v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). If a fact issue is raised regarding the making an agreement to arbitrate, § 4 requires the court to resolve the dispute at trial. *Id.*

## II. THIS CONTROVERSY IS EXEMPT FROM ARBITRATION UNDER SECTION 1 OF THE FEDERAL ARBITRATION ACT

Plaintiff's arbitration agreement is exempt from compelled arbitration pursuant to § 1 of the FAA, which expressly excludes from the Act all "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. §1.

### A. The Court, Not the Arbitrator, Must Determine Whether the Section 1 Exemption Applies

As noted above, the court's first duty when confronted with a motion to compel arbitration under § 4 is to determine whether an agreement covered by the FAA has been made, including whether the agreement is exempt under § 1, and the delegation clause contained in the arbitration

---

FAA form n single whole. Thus, when § 4 refers to the "making of the agreement for arbitration is not in issue" it is referring not to any arbitration agreement but an arbitration agreement covered by the FAA -- i.e. an agreement involving a "maritime transaction" or a "transaction involving commerce," FAA § 2, that is not exempt from the FAA pursuant to FAA § 1. *Bernhardt v. Polygraphic Co. of Am.,* 350 U.S. 198, 201 (1956); *In re: Van Dusen,* 654 F.3d 838, 844 (9th Cir. 2011).

agreement does not change that fact. *See Van Dusen v. Swift Transportation,* 544 Fed. Appx. 724 (9th Cir. 2013) (relying on *In re Van Dusen*, 654 F.3d 838, 844–45 (9th Cir. 2011), to order district court to decide § 1 exemption issue despite delegation clause in agreement); *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 14 (1st Cir. 2017) ("we are persuaded that the Ninth Circuit hit the nail on the head, and we therefore hold that the issue of whether the § 1 exemption applies presents a question of 'whether the FAA confers authority on the district court to compel arbitration' and not a question of arbitrability"). To compel arbitration so that an arbitrator can decide whether the agreement is exempt from the FAA would "put the cart before the horse," and would, in effect, "invoke the authority of the FAA to decide the question of *whether the parties can invoke the authority of the FAA*." *In re Van Dusen,* 654 F.3d at 844 (emphasis in original). Plainly the § 1 exemption issue is for the Court to decide.

B. **Plaintiff Is A Transportation Worker Covered By Section 1**

Section 1 of the FAA applies to contracts of employment of seamen, railroad employees, and "any other class of workers engaged in foreign or interstate commerce." Leaving aside the "contracts of employment" issue for the moment, the Supreme Court has interpreted the catch-all phrase "any other class of workers engaged in foreign or interstate commerce" to refer to workers directly involved in the actual transportation of goods in interstate commerce. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). As an interstate truck driver, Plaintiff is precisely the kind of worker covered by that phrase. *See Lenz v. Yellow Transp., Inc.,* 431 F.3d 348, 351 (8th Cir. 2005) ("if Lenz were a truck driver he would be considered a transportation worker under § 1 of the FAA); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 482–83 (S.D.N.Y. 2008) ("If there is one area of clear common ground among the federal courts to address this question, it is that truck drivers—that is, drivers actually involved in the interstate transportation of physical goods—have

10

been found to be 'transportation workers' for purposes of the residuary exemption in Section 1 of the FAA.") (listing cases in which the § 1 exemption was applied to truck drivers).

C. **Plaintiff's Contract Is a "Contract of Employment" Whether Plaintiff Is Independent Contractors or an Employee**

The First Circuit recently held in *Oliveira v. New Prime, Inc.,* 857 F.3d 7, 15-24 (1st Cir. 2017), that the term "contract of employment" as used in § 1 of the FAA refers to all agreements to perform work, without regard to the status of the worker as an employee or independent contractor. In reaching this conclusion, the First Circuit recognized that, in construing federal statutes, courts are to "look to the ordinary meaning of a term . . . at the time Congress enacted the statute"-- in this case 1925. *Id.* at 19, *quoting Perrin v. United States,* 444 U.S. 37, 42 (1979). With that in mind, the Court examined dictionaries and treatises from the era of the FAA's enactment and concluded that all of them regarded the phrase "contracts of employment" as encompassing agreements to do work agreements without regard to the worker's status as an employee or independent contractor. *Id.* at 20. The Court also cited numerous cases from the 1910-1925 era that similarly used the phrase "contract of employment" to encompass agreements with independent contractors and employees. *Id.* at 21 fn. 20.

Perhaps even more persuasively, the court concluded that treating "contracts of employment" as encompassing work agreements with transportation workers regardless of their status was consistent with the purpose of § 1. As explained by the Supreme Court in *Circuit City,* 532 U.S. at 121-120, the exemption was enacted out of "concern with transportation workers and their necessary role in the free flow of goods." But the "free flow of goods" may be disrupted just as easily by independent transportation workers as by employees. Thus limiting the § 1 exemption to employee transportation workers would undermine the fundamental purpose of the exemption. *New Prime, Inc.,* 857 F.3d at 22. In addition, as the *Circuit City* Court noted, by the time the FAA

11

was adopted, Congress had established statutory alternative dispute schemes for specific kinds of transportation workers and excluded such workers from the FAA because it "did not wish to unsettle" those schemes. 532 U.S. at 120-121. Those statutory alternative dispute schemes covered independent contractors as well as employees. *See New Prime,* No. 15-2364, Doc 00117026215, *Amicus brief of Professor Richard H. Frankel* at 11-23 (filed July 8, 2016); Doc 00117012966, *Brief of Plaintiff-Appellee* at 23-38 (filed July 8, 2016). Thus, the purpose of preserving those schemes also supports the conclusion that the "contracts of employment" referenced in § 1 were intended to encompass contracts with employees and independent contractors.

Because Plaintiff's Contract is unquestionably a contract to perform work for Western, it is a "contract of employment" of a transportation worker for purposes of FAA § 1 regardless whether the Contract created an employment or independent contractor relationship. Accordingly the arbitration agreement in the Contract is exempt from enforcement pursuant to § 1 of the FAA.

### D. **Plaintiffs' Contracts Created An Employment Relationship**

In reaching its conclusion regarding the meaning of § 1, the *New Prime* court rejected as unpersuasive a number of district court decisions that had assumed, without analysis, that the § 1 exemption applied only to contracts with employees. *New Prime,* 857 F.3d at 17-19. Nevertheless, even if this Court were to reject *New Prime* and determine that a transportation worker who is an independent contractor is not exempt pursuant to § 1, Plaintiff is an employee, not an independent contractor, and accordingly, this Court must still reject Defendant's request to compel arbitration pursuant to the FAA.

#### 1. <u>Plaintiff's Employee Status Must Be Evaluated Using the Common Law Standard</u>

If, contrary to *New Prime,* the § 1 exemption is limited to contracts with "employees" then it must be referring to common law employees. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318,

324 (1992) (absent a contrary definition, federal statutes referring to employees refer to employees as defined by the common law); *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) (remanding for trial court to apply common law test to determine employee status of plaintiff under Title VII). *See, e.g., Doe v. Swift Transportation Co.,* 2017 WL 67521 at *4 fn 30 (D. Az. Jan. 6, 2017) (applying the *Darden* common law employment factors to determine interstate truck drivers' contract was a contract of employment exempt under FAA § 1); *Bell v. Atlantic Trucking Co.*, 2009 WL 430564 (M.D. Fla. 2009) (same); *Gagnon v. Serv. Trucking Inc.*, 266 F. Supp. 2d 1361, 1365-66 (M.D. Fla. 2003) (applying common law employment factors to support conclusion that truck driver operating agreement was an exempt contract of employment).

The affidavits and evidence submitted with this brief demonstrate, as a matter of law, that Plaintiff's Contract made him a common law employee of Western, or, at the very least, that his status as an employee presents a fact issue necessitating discovery and a trial pursuant to FAA § 4.

### 2. <u>The Common Law Employment Standard</u>

Under the common law test, a court considers:

> the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired *324 party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24 (citations omitted). <u>The fact that the parties' contract may label a worker an independent contractor is neither controlling nor especially useful; rather, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive</u>." *Darden* at 323 (citation omitted, emphasis added). *See, e.g., Corp. Exp. Delivery Sys. v. NLRB*, 292 F.3d 777, 780 n * (D.C. Cir. 2002) (affirming the Board's determination that, although drivers

13

"were described in their contract as 'independent contractors,'" they were actually employees); *Peters v. O'Malley,* 2015 WL 12531995 at *1 (M.D. Tenn. Feb. 20, 2015) (under Tennessee law "labels placed upon workers in contracts or agreements are not binding[;]" a worker's status is determined based on the entire relationship). *See also, Doe v. Swift Transportation,* 2017 WL 67521 (D. Az. Jan 6, 2017) (finding worker exempt employee despite independent contractor label in his operating agreement); *Craig v. FedEx Ground Package Sys. (In re FedEx Ground Package Sys.)*, 792 F.3d 818, 819 (7th Cir. 2015) (same); *Bell v. Atlantic Trucking Co.*, 2009 WL 430564 at *6 (M.D. Fla. 2009) (same).

### 3.  <u>Application of the Common Law Standard</u>

Analysis shows that virtually all of the common law employment factors weigh heavily in favor of a finding of employee status:

<u>Plaintiff Performed Western's Core Business</u>: Plaintiff, and other lease operators, performed Western's core business function -- hauling freight. Moreover, they do so in exactly the same way as Western's employee drivers: Western's orientation and training classes were the same for employee drivers and lease operators. *DeJesus Decl.* ¶ 23; *Elmy Decl.* ¶ 25; *McCullough Decl.* ¶ 24; *Noonan Decl.* ¶ 19; *Riggs Decl.* ¶ 22. Indeed, Western used owner-operators to train its employee drivers in Western's policies and procedures. *DeJesus Decl.* ¶ 24. Procedures for assigning, picking up and delivering loads and hiring extra help to assist with loading and unloading were the same for employees and owner-operators, *DeJesus Decl.* ¶¶ 21-25; *Elmy Decl.* ¶¶ 23-26; *McCullough Decl.* ¶¶ 22-25; *Noonan Decl.* ¶¶ 18-20; *Riggs Decl.* ¶¶ 21-23, and all drivers, regardless of their designation, were required to follow the same paperwork procedures and procedures for staying in contact with the dispatch office and driver manager, *DeJesus Decl.* ¶ 26; *Elmy Decl.* ¶ 27; *McCullough Decl.* ¶ 26; *Noonan Decl.* ¶ 21; *Riggs Decl.* ¶ 24. This factor weighs

14

in favor of employee status. *Alexander v. FedEx Ground Package Sys,* 765 F.3d 981, 995 (9th Cir. 2014) (fact that drivers who are wholly integrated into defendant's operations and deliver to defendant's customers, not their own, weighs in favor of employee status); *Doe v. Swift,* 2017 WL 67521 at *6 (D. Az. Jan 6, 2017) (truck driver performing hiring party's core business is indicative of employee status).

Control: The Lease and Contract give Western total control over every aspect of a Driver's performance.[11] The Contract obligates a Driver to lease his truck to Western and operate under Western's operating authority and control, Contract ¶ 6, "a key indicia of an employment relationship." *Gagnon v. Serv. Trucking, Inc.,* 266 F. Supp. 2d 1361, 1366 (M.D. Fla. 2003). The Contract further requires Drivers to haul whatever loads Western assigns, Contract ¶ 1, pick them up and deliver them on time at the place specified by Western. Contract ¶ 7.J. Western controls the speed at which a Driver is permitted to drive. *DeJesus Decl.* ¶ 18; *Elmy Decl.* ¶ 22; *Noonan Decl.* ¶ 17. The Contract even gives Western the right to seize a Driver's truck and complete deliveries that Western, in its sole discretion, believes have not been properly or timely delivered. Contract ¶ 5.E. Finally, the Contract also gives Western control over the Driver's very demeanor stating that they must act in "such a manner as to assure continued customer satisfaction," including "being courteous to shipper and consignee." Contract ¶ 7.J. It is difficult to imagine how a company could exert greater control over workers who, by virtue of the nature of their work, operate alone away from the direct

---

[11] The Contract and Lease together formed his contract of employment. Even if they are viewed as separate documents, because they were signed at the same time, by the same parties, and each was dependent on signing the other, they must be construed together as a single document. *Helvering v. Le Gierse*, 312 U.S. 531, 540 (1941) (two contracts, one for life policy and one for life annuity, purchased on same date from same insurer, were required to be considered together in determining whether life policy was "insurance", notwithstanding one contract did not refer to the other, where it was conceded that life policy would not have been issued without the annuity contract).

supervision. Indeed, these are the same controls that Western exercises over its employee drivers. *DeJesus Decl.* ¶¶ 12-26; *Elmy Decl.* ¶¶ 16-27; *McCullough Decl.* ¶¶ 14-26*; Riggs Decl.* ¶¶ 15-24.

Western ensures Driver compliance with the above requirements, *and any other controls that Western chooses to impose,* through its ability to terminate the Contract at-will, coupled with the draconian financial consequences that automatically flow from termination. (Upon termination of the Contract, the Lease is automatically terminated, the truck forfeited, and all lease payments accelerated. Lease ¶¶ 18, 19, 23.) With this ever-present threat of financial ruin hanging over their heads, Drivers have little choice but to conform their way of working to whatever controls Western chooses to impose, including unilaterally changing the Contract. *See DeJesus Decl.* ¶ 20; *McCullough Decl.* ¶ 21. There is no greater control over a worker than the ability to unilaterally change the terms under which he works. Indeed, these provisions give Western far more control over lease operators than it has over its own employee drivers who, if terminated, would lose their jobs but suffer none of the financial penalties imposed on lease operators. This power to impose crushing debt on Drivers at will strongly supports a finding of employee status. *See Time Auto Transportation, Inc.,* 377 F.3d 496 (6th Cir. 2004) (finding long-haul truck drivers who leased their trucks from Time Auto to be employees and noting "we are particularly persuaded by the at-will nature of the contracts, the substantial down-payments made by [the drivers] recovery of which depends on employment by Time Auto"); *Doe v. Swift,* 2017 WL 67521 at *8 (finding similar at-will termination/lease default provision indicative of employee status).

Western's control over load assignments gave it control over when and how long Drivers worked since Drivers could not drive for anyone other than Western. *DeJesus Decl.* ¶¶ 31-32; *Elmy Decl.* ¶¶ 31-32; *McCullough Decl.* ¶¶ 31-32*; Noonan Decl.* ¶ 26; *Riggs Decl.* ¶¶ 29-30. In addition, Western could use its control over load assignments as yet another way to discipline Drivers and

16

ensure that they performed their work in a manner satisfactory to Western. Because Drivers were required to haul freight only for Western, the Driver's sole income source was dependent on Western providing profitable assignments. Thus, if Western stopped providing loads – or provided less desirable loads – the driver could quickly be forced into default.

Finally, Western unilaterally dictated the mileage rate that Drivers were paid, Contract ¶ 2 & Schedule 1, which, coupled with Western's control over load assignments, meant that Western had complete control over Drivers' earnings. A Driver's success was not based on any entrepreneurial or managerial skill but instead was contingent entirely on the number and kind of loads Western chose to assign to the Driver. *Doe v. Swift,* 2017 WL 67521 at *5 (Swift control over load assignments and mileage rate "dictated how much [Drivers] could earn" and is indicative of employment relationship).

Thus, the control factor weighs heavily in favor of employee status.

<u>Drivers Had No Meaningful Control Over Their Work</u>: While the Contract recites that Drivers retain the right to control the means and methods of their performance, Contract ¶ 7, in light of the controls imposed by Western, this was an empty phrase as little or nothing of significance was left for Drivers to control. Paragraph 7 only lists a couple of specific 'controls' exercised by Drivers:

Paragraph 7.F states that Drivers have the right to choose their routes but that is meaningless since, for the most part, there is only one cost effective route that will ensure the timely delivery required by Western. *See Narayan v. EGL, Inc.*, 616 F.3d 895, 904 (9th Cir. 2010) ("the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relationship."); *Ace Doran Hauling & Rigging Co. v. NLRB,* 462 F.2d 190 (6th Cir. 1972) (owner-operator interstate drivers were employees despite

17

having the freedom to select their own routes and refuse offered loads). When the specific route mattered, Drivers had no control but, instead, were contractually bound to follow the route specified by Western. Contract ¶ 7.F (Driver must follow routes designated by Western's customers).

Paragraph 7.D purports to give Drivers control over maintenance of the vehicle but, in fact, Western strictly controls when repairs must be made on trucks, Lease ¶ 8, and specifies that all maintenance over $250 has to be approved by Western and performed in locations approved by it, Lease ¶ 9. In addition the Contract gives Western the authority to establish a $10,000 maintenance reserve account, and $5,000 security account for each Driver funded out of the Driver's earnings, thereby depriving the Driver of the most basic control exercised by an independent business-- i.e. how to allot one's earnings among competing needs. Contract Schedule II ¶ 2.B. Drivers were also forbidden to alter or modify the trucks without Western's prior written approval. Lease ¶ 14.

The third "control" mentioned in paragraph 7 is the right to hire assistants to help with driving. But that control was also illusory as explained below in the section addressing the hiring of assistants. Everything else listed in Paragraph 7, and, indeed, the remaining provisions of the Contract, are not "controls" that Drivers could exercise, but detailed burdens and duties that Western was able to impose on Drivers by virtue of its superior bargaining position. The obligation to pay all operating expenses, ¶ 7.E, furnish Western with proof of compliance with regulatory requirements, ¶¶ 6, 7.C, 7.G, 7.H, 12, 13 (including Western's regulatory duties, ¶ 5.E), agree to drug testing, ¶ 8, and agree to indemnify Western for virtually anything that might happen, ¶¶ 5.E, 7.G, 9, 11, 14, do not evidence controls by which Drivers could make a profit; they simply evidence Western's power "to impose that added burden[s] on its operators." *Brock v. Mr. W. Fireworks*, 814 F.2d 1042, 1050 (5th Cir. 1987). *See also Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1369-70 (9th Cir. 1981) (risks accepted by operators as part of their contract are simply "burdens that Sureway chose to

18

place on them.").

Source of Instrumentalities and Tools: Western provided all the instrumentalities and tools used by Drivers. It not only provided the most important tool, the truck, it also financed the entire leasing process and allowed Drivers to obtain advances, fuel and other operating expenses, including insurance, on Western's credit. Contract ¶¶ 4, 12. Western also provided the customer base, the loads, the trailers, and the communications infrastructure that made it possible for Drivers to receive load assignments, directions to shippers and receivers, and necessary road assistance. This factor also favors employee status. *See Ruiz v. Affinity Logistics Corp.,* 754 F.3d 1093, 1103-1104 (9th Cir. 2014) (paid leasing arrangements evidence company control and it is "clearly erroneous" to view such arrangements as evidence of drivers' supplying their own equipment).

Drivers Had No Independent Business: Drivers obtain all the instrumentalities and tools of their work through Western -- a no money down truck, advances for all operating expenses, fuel cards, load assignments, vehicle maintenance schedules etc. When Drivers' Contract and Lease were terminated, their "business" was terminated with them. Drivers no longer had a truck, operating authority under which to drive, or customers to haul freight for. Once terminated they were indistinguishable from a terminated employee driver of Western (except terminated lease operators, unlike terminated employee drivers, generally found themselves owing substantial default penalties under the Lease). This factor weighs heavily in favor of employee status. *Max Trucking LLC v. Liberty Mutual Ins. Corp.*, 802 F.3d 793, 804 (6th Cir. 2015) (drivers have no independent business where they drive exclusively for carrier, where carrier provides complete business support package --even though the costs are charged to drivers-- and where drivers' truck and supplies are only obtained on basis of carriers credit); *NLRB v. H & H Pretzel Co.,* 831 F.2d 650, 654 (6th Cir. 1987) (affirming that drivers who lease their trucks from the company they drive

19

for and who are subject to unilateral termination "can only be characterized as employees"); *Affinity,* 754 F.3d at 1103-1104 (where Affinity helped drivers set up their businesses, advanced costs of leasing and maintaining trucks, drivers had no independent business*); Doe v. Swift,* 2017 WL 67521 at \*6 ("Cost advancing and leasing arrangements that allow drivers to operate are evidence of an employment relationship."), at \*14 (Swift's assistance in providing the necessary equipment and credit through cost-advancing and leasing arrangements is evidence the Plaintiffs did not actually operate autonomously.").

Hiring and Paying Assistants: Paragraph 7 of the Contract gives Drivers the right to hire and set the wages of co-drivers. Contract ¶ 7.A. However, because the Driver is compensated at a fixed mileage rate, a Driver can only pay a hired helper by sharing his per-mile earnings. Thus hiring a helper is of little significance. *Slay Transportation,* 331 NLRB 1292, 1294 (2000) (discounting right to hire employees as evidence of independence because "owner-operator can only negotiate that driver's wages within the compensation rate set by the Employer."). The significance of the right to hire co-drivers is further diminished by ¶ 5.C of the contract which provides that any such helper must be pre-approved by Western. Contract ¶ 5.C. *See Affinity Logistics,* 754 F.3d at 1102-03 (finding the right to hire helpers of little significance where employer had to approve hires and require them to comply with company policies). Thus this factor is neutral.

Skill: Drivers performed exactly the same task as employee drivers and required no more skill. *DeJesus Decl.* ¶¶ 12-26; *Elmy Decl.* ¶¶ 16-27; *McCullough Decl.* ¶¶ 14-26*; Riggs Decl.* ¶¶ 15-24. *Compare* Doc. 25-2 (Elmy application to become employee driver) *with* Doc. 25-3 (Elmy application to become lease operator). Accordingly this factor favors employee status. *Alexander,* 765 F.3d at 995.

Duration of Employment: Drivers are not hired to perform a specific project; rather the

Contract is of indefinite duration subject to either party's right to terminate at-will on 10 days' notice. Contract ¶ 25. Both the indefinite duration and at-will provisions strongly indicate employee status. *See Alexander*, 765 F.3d at 996 (automatic renewal for successive one-year terms on satisfactory performance weighs in favor of employee status); *Doe v. Swift,* 2017 WL 67521 at *5 (same); *Narayan*, 616 F.3d at 900 (right to fire at-will is "the most important" indicia of an employment relationship); *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984) (at-will termination provision indicates employee status).

Method of Payment: Western unilaterally set a Driver's compensation rate at a fixed rate per mile driven.[12] Contract Addendum 1. A mileage rate is a piece rate, a form of payment that indicates an employment relationship. *Affinity Logistics Corp.*, 754 F.3d at 1104-05 (9th Cir. 2014) (holding that payment by a regular rate of pay—in that case per delivery—weighed in favor of employee status); *Dole v. Snell*, 875 F.2d 802, 809 (10th Cir. 1989) (toiling for money on a piecework basis is more like wages than an opportunity for "profit."). The non-negotiable nature of the compensation also weighs in favor of employee status. *Fedex Home Delivery*, 361 NLRB No. 55, *19 (Sept. 30, 2014) (fact that compensation can't be negotiated generally minimizes possibility of meaningful economic gain and indicates employee status).

Label and Taxes: The Contract recites that Drivers are independent contractors and makes them liable for their own taxes. However these provisions are of no significance since they were not negotiated but simply imposed on Drivers along with the rest of Western's contract of adhesion. *See Affinity Logistics*, 754 F.3d at 1105 (fact that parties believe they are creating independent contractor relationship "is not dispositive and will be ignored if their actual conduct

---

[12] Some Drivers are paid by a percentage of the load but Western still unilaterally sets the percentage and thus the amount a Driver makes remains dependent on the loads that Western chooses to assign or not assign — it is a piece rate by another name.

21

establishes a different relationship"); *Seattle Opera v. NLRB*, 292 F.3d 757, 764 fn 8 (D.C. Cir. 2002) ("if an employer could confer independent contractor status through the absence of payroll deductions there would be few employees falling under the protection of the Act").

In sum, the Lease and Contract documents coupled with the declarations of the Plaintiff Drivers demonstrate that the common law employment factors compel the conclusion that Plaintiff and similarly situated Drivers who signed Western's Lease and Contract were, as a matter of law, employees of Western. *See Alexander,* 765 F.3d at 988 (finding drivers employees as a matter of law based on the terms of their contracts and FedEx's policies and procedures); *Swift,* 2017 WL 67521 at *8-11 (finding that lease/contract virtually identical to Western's on its face created employment relationship exempt from arbitration pursuant to FAA § 1). Accordingly, even under a narrow construction of FAA § 1, workers like Plaintiff are exempt from compulsory arbitration and the motion to compel arbitration should be denied.

At the very least, Plaintiff has submitted more than sufficient evidence to create a fact issue as to whether he and other Drivers are common law employees of Western exempt under FAA § 1. Thus, if Drivers are not found to be employees as a matter of law, a trial of that question must be conducted pursuant to § 4 of the FAA before this court can rule on Western's motion to compel arbitration. Before conducting such a trial, Plaintiff is entitled to engage in discovery directed to the employment issue. *See Guidotti v. Legal Helpers Debt Resolution, LLC,* 716 F.3d 764, 776 (3d Cir. 2013) (if making of arbitration agreement is in issue parties should be afforded opportunity to conduct discovery on that issue); *Deputy v. Lehman Bros., Inc.,* 345 F.3d 494, 511 (7th Cir. 2003) (FAA Section 4 provides for discovery before trial).

## III. THE ARBITRATION AGREEMENT VIOLATES FEDERAL LAW

Although the § 1 exemption is sufficient to resolve Western's motion to compel arbitration,

in the unlikely event that this Court were to reject the exemption defense and find Plaintiff's agreement subject to compulsory arbitration under § 4, arbitration should still be denied because it effectively precludes Plaintiff from vindicating the federal statutory claims plead in his complaint. The FAA can be invoked to enforce arbitration of federal statutory claims only if the arbitration clause "allow[s] for the effective vindication of [the statutory] claim" and does not contravene federal statutory rights. *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306, 313 (6th Cir. 2000). The legality of provisions alleged to violate federal statutory rights is a question of law for the Court rather than the arbitrator despite the delegation clause in the arbitration agreement.[13] *See Doe #1 v. Deja Vu Consulting Inc.,* 2017 WL 3837730 at *10 (M.D. Tenn. Sept. 10, 2017) *citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628 (1985). *See also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83–84 (1982) ("The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in ... federal statutes.... Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power."). As the Sixth Circuit stated in a case in which the arbitration clause limited the remedies available under the plaintiffs' federal statutory claim:

> It is well-established that "a party does not forgo the substantive rights afforded by [a] statute [when she agrees to arbitrate a statutory claim but] only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quotation omitted). . . . The critical question is not whether a claimant may obtain *some* amount of the entire range of remedies under Title VII, but whether the limitation on remedies at issue undermines the rights protected by the statute. *See Gilmer,* 500 U.S. at 26–27, 111 S.Ct. 1647. *See also McCaskill v. SCI Mgmt. Corp.,* 285 F.3d 623, 626 (7th Cir.2002) (holding that arbitration agreement that did not provide for award of attorney fees to successful Title VII claimant was

---

[13] Defendants agree that legality issues should be resolved by this Court since they argue these issues to the Court in their brief.

unenforceable because "[t]he right to attorney's fees ... is central to the ability of persons to seek redress from violations of Title VII"); *Perez v. Globe Airport Sec. Servs., Inc.,* 253 F.3d 1280, 1286 (11th Cir.2001) ("[F]ederal statutory claims are arbitrable only when arbitration can serve the same remedial and deterrent functions as litigation, and an agreement that limits the remedies available cannot adequately serve those functions.") (citing *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1061–62 (11th Cir.1998)).

*Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 670 (6th Cir. 2003).

### A. The Requirement That The Parties Share "Any AAA or Arbitrator Fees and Expenses Equally" Violates the FLSA and the Federal Forced Labor Statute

The arbitration provision provides that "[t]he parties shall share any AAA or arbitrator fees and expenses equally." The Sixth Circuit has taken a "revised case-by-case approach" to determining whether such cost splitting provisions violate federal statutory rights. *Morrison,* 317 F.3d at 663 (en banc). Under this approach "if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute." *Id.* Applying this standard to the facts of the *Morrison* case, the Court did not hesitate to find the cost-splitting provision unlawful in a statutory employment case:

> Minimal research will reveal that the potential costs of arbitrating the dispute easily reach thousands, if not tens of thousands, of dollars, far exceeding the costs that a plaintiff would incur in court. Courts charge plaintiffs initial filing fees, but they do not charge extra for in-person hearings, discovery requests, routine motions, or written decisions, costs that are all common in the world of private arbitrators. Based on one recent study using costs and estimates provided by three major arbitration providers themselves, a plaintiff forced to arbitrate a typical $60,000 employment discrimination claim will incur costs, depending on which company is chosen to provide the arbitration, that range from three to nearly *fifty* times the basic costs of litigating in a judicial, rather than arbitral, forum. *See* Public Citizen, The Costs of Arbitration 40–42 (2002).

*Id.* at 669. The conclusion that the cost-splitting provision would be prohibitive both for Plaintiff and other similarly situated workers is supported by Drivers' declarations which show that, given Drivers' economic circumstances, it would be impossible for Drivers to pay initial filing fees and

24

arbitrator fees. *DeJesus Decl.* ¶¶ 36-43; *Elmy Decl.* ¶¶ 38-43; *McCullough Decl.* ¶¶ 36-42*; Noonan Decl.* ¶¶ 30-35; *Riggs Decl.* ¶¶ 35-42. As a result, Drivers simply would not bring their cases. *Id.*

Unlike the arbitration agreement at issue in *Morrison,* the Plaintiff's agreement contains no severance provision. Accordingly, the unlawful nature of the cost-splitting provision cannot be severed and stands as a bar to enforcement of the arbitration agreement as a whole.

### B.  The Requirement That Claims Be Brought Within One Year Violates the FLSA and the Federal Forced Labor Statute

In adopting the FLSA, Congress expressed its intent that workers have two years to bring claims (three years if the employer's violation was willful) and recover damages for that full limitations period. 29 U.S.C. § 255. Similarly, the federal Forced Labor Act expressed Congress intent that individuals be able to collect up to ten years' of damages for work performed prior to the filing of the complaint. 18 U.S.C. § 1595. The arbitration agreement directly contradicts these statutory provisions by stating that disputes not brought within one year are deemed waived. Such a provision clearly violates the FLSA because it deprives the Plaintiff of the full compensatory recovery authorized by the statute.[14] *Pruiett v. West End Restaurant, LLC,* 3:1-747, 2011 WL 5520969 (M.D. Tenn. Nov. 14, 2011) (Trauger, J.) (finding one year limitations period in arbitration agreement contrary to the FLSA and unenforceable); *Davis v. O'Melveny & Myers* 485 F.3d 1066, 1076 -1077 (9th Cir. 2007). Again, because neither the arbitration provision nor the Contract contains a severability clause, this unlawful provision cannot be severed. Accordingly, it stands as a bar to enforcement of the arbitration agreement.

### C.  Waiver of Fees

---

[14] Plaintiff was hired as a lease operator in February 2016 and terminated his employment in February 2017. Doc 25 at 4. Because he filed his complaint in August 2017, the one year limitation in the arbitration agreement only allows him to recover damages for the period August 2016 to February 2017. Damages he suffered between February 2016 and August 2016 are deemed waived even though they are recoverable under the two-year limitation.

The arbitration agreement states that the parties "shall be responsible for their own . . . attorneys' fees." Contract ¶ 24. This provision is in direct conflict with the FLSA and the federal Forced Labor Act, both of which explicitly provide for an award of attorneys' fees to workers who prevail on claims under those statutes. 29 U.S.C. § 216(b); 15 U.S.C. § 1595(a). Such a provision in arbitration agreement cannot be enforced. *Quilloin v. Tenet HealthSystem Phila, Inc.,* 673 F.3d 221, 230-31 (3d Cir. 2012) ("Provisions requiring parties to be responsible for their own expenses, including attorney's fees, conflicts with federal statutes providing fee shifting as a remedy."); *Zambrano v. Strategic Delivery Solutions, LLC,* 2016 WL 5339552 at *1, 6 (S.D.N.Y. Sept. 22, 2016) (arbitration provision requiring each party to bear their own attorneys' fees conflicts with FLSA and is unenforceable); *Coram v. Shepherd Communications, Inc.,* 2014 WL 4782826 at *2 (W.D. Ky. Sept. 24, 2014) (arbitration provision stating "each party shall be responsible for its own attorneys' fees" is unenforceable in an FLSA action).

### D. The Class and Consolidated Action Waiver In the Arbitration Clause Violates the Fair Labor Standards Act and the NLRA.

Finally, the arbitration clause violates Plaintiff's statutory right to bring FLSA and federal Forced Labor Act claims as a class action or, if the Court interprets the arbitration clause to bar collective actions, as a collective action.[15] Such a prohibition directly conflicts with the FLSA guarantee of the right to sue on a collective basis, 29 U.S.C. § 216(b), and with Congressional policy set forth in the National Labor Relations Act (NLRA) permitting employees to act in concert to protect their rights. *See NLRB v. Alternative Entertainment, Inc.,* 858 F.3ed 393 (6th Cir. 2017) (collective and class action waiver in arbitration agreement violates NLRA); *Lewis v. Ernst &*

---

[15] Plaintiff does not believe that the class and consolidated waiver bars collective actions pursuant to the Fair Labor Standards Act for the reasons set forth in Section V below. However, if the Court interprets the arbitration provision to bar collective actions, such waiver is also unlawful.

26

*Young, LLP,* 834 F.3d 975 (9th Cir. 2016) (holding collective action waiver in arbitration agreement violates both the FLSA and the NLRA); *Lewis v. Epic Sys. Corp.,* 823 F.3d 1147 (7th Cir. 2016) (holding collective action waiver in arbitration agreement violated the NLRA and was unenforceable). *See also Killion v. KeHE Distribs.*, LLC, 761 F.3d 574, 592 (6th Cir. 2014) (agreement waiving right to bring FLSA collective actions in court unenforceable); *Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603 (6th Cir. 2013) (same). The majority of district courts in the Sixth Circuit have read *Alternative Entertainment* as prohibiting enforcement in employment actions of arbitral class/collective action waivers. *Hubbard v. Dolgencorp, LLC,* 2017 WL 4323588 at *5 (W.D. Tenn. Supt. 28, 2017) (holding class/collective action waiver in arbitration agreement unenforceable in case raising FLSA and Illinois minimum wage claims); *Curatola v. Titlemax of Tennessee, Inc.,* 2017 WL 3820971 (W.D. Tenn. June 8, 2017) (same, employment claims); *Gaffers v. Kelly Services, Inc.* 203 F.Supp.3d 829, 839-842 (E.D. Mich. 2016) (same, FLSA action).

Plaintiff recognizes that this Court has recently issued two nearly identical decisions upholding such waivers, *Doe #1 v. Deja Vu Consulting Inc.,* 2017 WL 3837730 (M.D. Tenn. Sept. 1, 2017) and *Myers v. TRG Customer Solutions, Inc.,* 2017 WL 3642295 (M.D. Tenn. Aug. 24, 2017). However, the three reasons offered in these cases for upholding the collective/class action waiver do not withstand scrutiny. The court first held that the plaintiffs in those cases were not employees as defined by the NLRA because they were no longer working for the defendant. Even if that were correct, that argument overlooks the Sixth Circuit's holding that, in determining whether an arbitration provision conflicts with federal law, a court must not only consider the situation of the named plaintiff, but that of other similarly situated workers affected by the provision. *Morrison,* 317 F.3d at 663. Here, Plaintiff seeks to bring an action not only on behalf

of himself but other similarly situated employees of Western, many of whom are NLRA employees currently working for Western as lease operators. The consolidated and class action waiver and, if this Court so interprets, the collective action waiver in Plaintiff's arbitration agreement clearly precludes those NLRA employees from exercising their FLSA and NLRA rights to act in concert by joining Plaintiff's suit. That direct interference with concerted action by current employees is, no doubt, one of the reasons why the court in *Morris* did not hesitate to strike down the class action waiver in that case despite the fact that the named plaintiffs were <u>former</u> employees. *Morris,* 834 F.3d at 979 (describing plaintiffs as having "worked" for Ernst and Young).

Second, the decisions question whether an FLSA collective action constitutes "concerted activity" but cites nothing to support that position. *Doe #1,* 2017 WL 3837730 at *12. In fact, as explained at length by the Seventh Circuit in *Lewis,* 823 F.3d at 1152-1154, circuit courts throughout the country have recognized that "the filing of collective and class actions constitute[] concerted activity" for purposes of the NLRA protection. The Sixth Circuit agreed in *Alternative Entertainment* holding. 858 F.3d at 402 ("Concerted activity includes 'resort to administrative and judicial forums'"). It is difficult to imagine a more direct form of concerted action than employees joining together to pursue a claim for unpaid FLSA wages or for damages resulting from violations of the Forced Labor Act.

Third, *Doe #1* finds that *Alternative Entertainment* "appear[s] to be limited to claims brought under the NLRA," without citing to any particular passage in *Alternative Entertainment* to support that reading. *Doe #1,* 2017 WL 3837730 at *12. In fact, the Sixth Circuit could not have been clearer that its holding applied to all employment law lawsuits. It stated unequivocally, "[t]he NLRA prohibits mandatory arbitration provisions *barring collective or class actions suits* because they interfere with employees' right to engage in concerted activity." *Alternative Entertainment,*

858 F.3d at 403 (emphasis added). The Court was even more forceful in the conclusion to its opinion: "We join the Seventh and Ninth Circuits in holding that an arbitration provision requiring employees covered by the NLRA individually to arbitrate _all employment related claims_ is not enforceable." _Id._ at 408 (emphasis added).

In sum, none of three reasons offered in _Doe #1_ for disagreeing with the clear mandate of _Alternative Entertainment_ withstands scrutiny. Accordingly, if the court finds Plaintiff's arbitration agreement is covered by the FAA, this Court should find the class and consolidated action waiver and, if the Court interprets the arbitration provision to bar collective actions, the collective action waiver contained therein to be unlawful and unenforceable. Plaintiff's arbitration agreement explicitly states that such ruling would render the entire arbitration agreement "null and void," Contract ¶ 24, and, accordingly, the motion to compel arbitration must be denied.

## IV. THE DELEGATION CLAUSE AND THE ARBITRATION AGREEMENT ARE UNCONSCIONABLE AND UNENFORCEABLE

In addition to all of the above reasons for denying the motion to compel arbitration, arbitration should also be denied because the agreement is unconscionable and unenforceable. However, because there is a delegation clause in the agreement, Plaintiff's unconscionability arguments must be addressed to that clause in the first instance. _Rent a Center West Inc v. Jackson_, 561 US 63 (2010). Once the delegation clause is shown to be unenforceable, Plaintiff's challenges to the unconscionable aspects of the arbitration agreement itself may then be considered by the Court.

### A. The Delegation Clause Is Unconscionable

Under Tennessee law, "[a]n unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice." _Taylor v. Butler,_ 142 S.W.3d 277, 285 (Tenn. 2004). The delegation clause at issue here falls squarely within that definition. The clause requires Plaintiff to

29

present certain 'gateway' questions of arbitrability, including his claim that the arbitration agreement is unconscionable, to the arbitrator rather than to the district court. However, in order to present those gateway questions to the arbitrator, Plaintiff must bear half of the filing fees and half of the arbitrator's fees. As demonstrated above those costs will be prohibitive for Plaintiff. Even if the gateway issues are limited to the unconscionable lack of mutuality in the arbitration agreement and the unconscionable limitations on discovery imposed by the arbitration agreement, as Plaintiff contends, those issues present complex legal issues that are likely to involve significant time and fees for the arbitrator in addition to the initial filing fees Plaintiff would have to pay to be able to present those issues to an arbitrator. Declaration of Lesley Tse ("*Tse Decl.*") ¶¶ 6-15 (estimating share of filing fees for each Plaintiff of a minimum of $775 and arbitrator fees of $6,000 to $8,000). If any or all of the other challenges to the legality of the agreement outlined above in Section II and III of this brief are considered threshold issues covered by the delegation clause, the costs would be even more prohibitive. Those issues include whether: (1) Plaintiff is an employee exempt from arbitration, (2) the fee splitting provision is unlawful, (3) the one year limitations period is unlawful, and (4) the class and collective action waivers are unlawful. The arbitrator costs to litigate those issues would be extraordinary, especially considering that the claims to be litigated in this action include allegations that Plaintiff earned less than the federal minimum wage while working for Western. The first issue alone will involve extensive discovery and, in effect, require litigation of the entire case. As explained above, Plaintiff cannot afford those costs. The delegation clause, in effect, operates to bar Plaintiff from pursuing his legitimate challenges to the validity and enforceability of the arbitration agreement. In those circumstances the delegation clause must be deemed to be unconscionable and unenforceable.

### B.  The Arbitration Clause is Unconscionable and Unenforceable

Because the delegation clause is unconscionable, the district court may proceed to determine Plaintiff's challenges to the unconscionability of the arbitration agreement itself. The arbitration agreement is unconscionable for three reasons: (1) the Agreement requires Plaintiff to split AAA and arbitrator fees and expenses, (2) the Agreement lacks mutuality of obligation, and (3) the Agreement mandates use of the AAA commercial rules which so severely limit discovery as to make it impossible for Plaintiff to pursue his claim. Plaintiff has already addressed the first issue and so will proceed to the second and third issues.

### 1. The Agreement Lacks Mutuality of Obligation

The arbitration provision requires that Plaintiff arbitrate all of his claims against Western, but allows Western to pursue a civil lawsuit against Plaintiff in court "(1) to recover any property or equipment belonging to [Western] . . . (2) to recover any advances, or other sums due from Contractor under ¶ 4 . . . (3) to recover its attorney's fees, costs and expenses incurred in such civil lawsuit." Contract ¶ 24. These provisions, particularly the right to sue for any "other sums due from Contractor under ¶ 4" effectively give Western a right to go to court for any claim it might conceivably file under the contract.[16] Such extreme non-mutuality of remedies is clearly unconscionable under Tennessee law, rendering the arbitration provision unenforceable, particularly in light of the many other one-sided and unfair provisions in the contract outlined above.[17] *Berent v. CMH Homes, Inc.*, 466 S.W.3d 740, 751 (Tenn. 2015) (holding lack of mutuality of remedies in arbitration agreement unconscionable depending on "the degree of one-sidedness" in the arbitration provision and the "in viewing the arbitration provision in the contest of the overall

---

[16] Paragraph 4 references Schedule II to the Contract which lists every possible amount that a driver might owe Western.

[17] The fact that the Contract allows Western to terminate a Driver at will and thereby automatically place him in default of his lease with all of the draconian financial consequences flowing from such a default is just one of the more extreme unconscionable provisions.

contract and surrounding circumstances"); *Taylor v. Butler*, 142 S.W.3d 277, 286 (Tenn. 2004) (non-mutual arbitration provision unconscionable where automobile dealership could take buyer to court for practically all claims that it could have against buyer but required buyer to arbitrate all claims against dealership). The non-mutuality in Plaintiff's agreement is far more the non-mutuality found to be unconscionable in *McGregor v. Christian Care Center of Springfield, LLC*, 2010 WL 1730131 at \*6 (Tenn. App. Apr. 29, 2010), cited with approval in *Berent*, 466 S.W.3d at 751. In *McGregor*, a nursing home required residents to sign arbitration agreements but reserved the right to go to court only with respect to claims of non-payment by a resident. Nevertheless that partial non-mutuality was enough to render the clause unenforceable. *See also Brown v. Tenn. Title Loans, Inc.*, 216 S.W. 3d 780, 786 (Tenn. App. 2006) (finding partially non-mutual arbitration agreement unconscionable).

## 2. The Agreement Unconscionably Limits Discovery

Because the merits issues raised by Plaintiffs claims are so fact intensive, including whether Plaintiffs were misclassified under the FLSA, a considerable amount of discovery will be needed. Yet the AAA Commercial Rules (unlike the AAA Employment Rules) make no provision for discovery or depositions. *Compare* Employment Rule 9 *with* Commercial Rules 21 and 22. At most, the arbitrator has discretion to allow exchange of documents "with a view to achieving an efficient and economical resolution of the dispute." Commercial Rule 22. The complete lack of depositions and limited document exchange in a complex employment case is unconscionable. In most employment cases, discovery is driven by depositions with document-discovery tending to refute or confirm the deposition testimony. *Dreher v. Eskco, Inc.* 2009 WL 2176060, 17 (S.D. Ohio 2009). The most significant documents, moreover, are often in the defendant/employer's possession, rather than employee's possession. *Id.* In *Dreher,* the court held that, an agreement's reliance on the AAA's

Commercial Rules rather than its Employment Rules works an unfair advantage to the employer and potentially prejudiced Plaintiff's ability to support her claims and to challenge defenses. It found that "although some limitations on discovery are expected during arbitration," *see Circuit City,* 532 U.S. at 123, "a wholesale preclusion of the taking of depositions is unenforceable." *Dreher,* 2009 WL 2176060 at 17; *cf. Walker v. Ryan's Family Steak Houses, Inc.,* 400 F.3d 370, 387-88 (6th Cir. 2005) (under the circumstances at issue in *Walker,* limitation to one deposition as of right substantively unconscionable); *Roderick v. Mazzetti & Associates, Inc., No.* C 04-2436 MHP, 2004 WL 2554453, 6 (N.D. Cal. Nov. 9, 2004) (finding Commercial Rules inappropriate compared to Employment rules with regard to discovery, access to evidence, power to subpoena witnesses).

## V.  IF THE COURT COMPELS ARBITRATION, PLAINTIFFS MUST BE ALLOWED TO PROCEED COLLECTIVELY AS THE ARBITRATION CLAUSE DOES NOT PROHIBIT COLLECTIVE ACTIONS

Under established principles of contract interpretation including the doctrine of *expressio unius est exclusio alterius*, *see, e.g.*, *Constr. Enterprises, Inc. v. Waterstone at Panama City Apartments, LLC*, No. 3:10-00711, 2011 WL 4431824, at *2 (M.D. Tenn. Sept. 22, 2011) ("*Expressio unius est exclusio alterius*" is a maxim of contract construction acknowledged under [] Tennessee law… It means the expression of one thing excludes all others…"), the arbitration provision permits FLSA collective actions since a provision prohibiting only consolidated or class arbitration does not prohibit collective arbitration. *See, e.g.*, *Cilluffo v. Cent. Refrigerated Servs., Inc.*, No. EDCV 12-00886 VAP, 2012 WL 8523474, at *2 (C.D. Cal. Nov. 8, 2012) (ordering collective arbitration of FLSA claims where arbitration clause prohibited "consolidated" or "class" arbitrations, but not "collective" arbitrations); *Chapman v. Lehman Bros.*, 279 F. Supp. 2d 1286 (S.D. Fla. 2003) (arbitration clause prohibiting class actions did not prohibit collective actions).

Here, Defendants drafted highly sophisticated agreements that specifically prohibit class

actions and consolidated actions, but do not prohibit collective actions. *Compare with Huffman v. Hilltop Companies*, LLC, 747 F.3d 391, 398 (6th Cir. 2014) (parties' arbitration clause silent on classwide arbitration); *Deja Vu*, 2017 WL 3837730 at *8 (arbitration provision stated that arbitrator may not consolidate more than person's claims, and may not preside over any form of "representative, class, or collective proceeding"). The clause must be construed against them as the drafters. *See Victoria v. Superior Court* 40 Cal.3d 734, 739, 710 P.2d 833 (1985) (ambiguities in standard form or adhesion contracts construed against drafter).

"Rule 23 actions are fundamentally different from collective actions under the FLSA." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74, 133 S. Ct. 1523, 1529, 185 L. Ed. 2d 636 (2013). *See also Smith v. T-Mobile USA Inc.*, 570 F.3d 1119, 1122 (9th Cir. 2009) (detailing "structural distinctions between a FLSA collective action and a Rule 23 class action"); *Espenscheid v. Direct Sat USA, LLC*, 688 F.3d 872, 874 (7th Cir. 2012) (key difference between collective action brought under FLSA and Rule 23 class action is that, in former, "class members must opt into the suit in order to be bound by the judgement in it, while in a class action governed by Fed. R. Civ. P. 23 they must opt out not to be bound by the judgment"); *Larson v. Rush Fitness Corp.*, No. 3:12-CV-109, 2013 WL 5350640, at *3 (E.D. Tenn. Sept. 23, 2013), *citing Comer v. Wal–Mart Stores, Inc.,* 454 F.3d 544, 546 (6th Cir. 2006) ("An FLSA representative action is called a collective action and is different from a class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure...").

Similarly, an FLSA action is not a "consolidated action" governed by Fed. R. Civ. P. 42. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095-97 (11th Cir. 1996) (discussing difference between collective action under FLSA and consolidation under Fed. R. Civ. P. 42); *Mork v. Loram Maint. of Way, Inc.*, 844 F. Supp. 2d 950, 2012 WL 38628, at * 5 (D. Minn. Jan. 9, 2012)

34

("Consolidation is a method by which a Court may efficiently resolve otherwise legally independent claims which happen to share a common question of law or fact. *See* Fed. R. Civ. P. 42(a). A FLSA collective action, in contrast, is a mechanism in which one claim can vindicate the rights of many.").

Construing the arbitration agreement against the drafter, the Defendants' arbitration agreement's prohibition on consolidated or class arbitration does not prohibit collective arbitration. Accordingly, Plaintiffs' should be permitted to proceed collectively in arbitration.

## CONCLUSION

For all of the foregoing reasons, Western's motion to compel arbitration should be denied. Congress has clearly indicated that arbitration agreements appearing in the employment contracts of transportation workers, such as Plaintiff's, are exempt from arbitration. Even if that were not the case, arbitration cannot be compelled because the arbitration agreement violates the federal statutory law controlling Plaintiff's claims by limiting damages to a one year period, precluding an award of attorneys' fees, imposing prohibitive costs, and barring collective and class actions. Finally, the delegation clause in the agreement is unconscionable and unenforceable as a result of the unreasonable costs it imposes on Plaintiff and, because it is unenforceable, the Court can reach the merits of Plaintiff's challenges to the unconscionability of the arbitration agreement itself. Accordingly the Court should find that the agreement is unconscionable and unenforceable because it lacks mutuality of obligation and unreasonably limits Plaintiff's discovery rights. Given these many problems with the arbitration agreement and the lack of a severance clause in the contract, severance is not an option and the motion to compel arbitration should be denied.

35

Respectfully Submitted,

*/s/ Lesley Tse*

Lesley Tse (*pro hac vice*)
Michael J.D. Sweeney (*pro hac vice*)
Getman, Sweeney & Dunn, PLLC
260 Fair Street
Kingston, New York 12401
Telephone: (845) 255-9370
Fax: (845) 255-8649
Email: ltse@getmansweeney.com

Justin L. Swidler, Esq. (*pro hac vice*)
Swartz Swidler, LLC
1101 Kings Hwy N., Ste 402
Cherry Hill, NJ 08034
Tel: (856) 685-7420
Fax: (856) 685-7417
Email: jswidler@swartz-legal.com

ATTORNEYS FOR PLAINTIFFS