| | |
|---|---|
| **JOHN ELMY, GERALD BIERNOT, and DERROTIS HOLMES, individually and on behalf of all other similarly situated persons,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**WESTERN EXPRESS, INC., NEW HORIZONS LEASING, INC., and JOHN DOES 1-5,**<br><br>       **Defendants.** | **Case No. 3:17-cv-01199**<br><br>**SECOND AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT** |

## SECOND AMENDED COLLECTIVE & CLASS ACTION COMPLAINT

1. Plaintiffs John Elmy, Gerald Biernot, and Derrotis Holmes, individually and on behalf of all other similarly situated persons, by and through undersigned counsel, hereby complain as follows against Defendants Western Express, Inc. ("Western"), New Horizons Leasing, Inc. ("New Horizons"), and John Does 1-5 (collectively "Defendants").

### INTRODUCTION

2. Defendants Western and New Horizons are private companies, owned and operated by the same people, including Paul Wieck and Richard Prickett, for a common business purpose, i.e. moving freight interstate for customers of Western.

3. Plaintiffs are current and former long-haul truck drivers who are lured into a scheme by which:

  a. Defendants induce Plaintiffs into becoming so-called "Owner Operators"[1] by

---

[1] While Defendants refer to drivers who they lease trucks to as "Owner Operators," these drivers do not actually own the trucks and thus will also be referred to in this Complaint more accurately as "lease operators."

misrepresenting material facts about the Owner Operator program including how much money they will earn;

    b.  Defendants require Plaintiffs to sign an unconscionable Equipment Lease ("Lease") and Contract Hauling Agreement ("Contract"), referred to herein collectively as "Agreements," on a "take-it-or-leave-it" basis to become lease operators;

    c.  Defendants will lease trucks to Plaintiffs for exclusive re-lease back to Western;

    d.  Defendants treat Plaintiff lease operators as independent contractors, even though Defendants will exert control over every aspect of Plaintiffs' work;

    e.  Plaintiffs cannot drive their leased truck for any other company;

    f.  Plaintiffs bear virtually all expenses required to deliver Defendants' freight; and

    g.  Defendants coerce Plaintiffs to continue driving trucks for the Defendants for long periods at a time under threat of crushing financial debt and fear that they will lose the ability to work in the trucking industry again should they leave their employment with Defendants.

4.    This case seeks redress under Tennessee common law for fraud and negligent misrepresentation for Defendants' scheme to misrepresent material facts about the Owner Operator program in order to induce Plaintiffs to become Owner Operators.

5.    This case also seeks redress under the Tennessee common law of contracts for unconscionability, for the unconscionable Lease and Contract that Defendants require Plaintiffs to sign on a "take-it-or-leave-it" basis to become lease operators. The terms of the Lease and Contract are so one-sided that Plaintiffs are denied any opportunity for meaningful choice.

6.    This case also seeks redress under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* for Defendants' failure to pay Plaintiffs minimum wages through misclassification of Plaintiff

2

lease operators as "independent contractors" when by law they are employees.

7.      This case also seeks redress under Tennessee common law for unjust enrichment for Plaintiffs conferral of a benefit upon Defendants by acting as employees but being misclassified as independent contractors. Plaintiffs performed the primary business in which Defendants are engaged and were controlled by Defendants but had to bear employment-related expenses and were not subject to federal and state protections for employees.

8.      This case also seeks redress under the Federal Forced Labor statute, 18 U.S.C. § 1589, for Defendants' scheme to tie the lease operators treated as independent contractors to labor for Defendants for long periods of time under threat of serious financial harm.

9.      This case also seeks redress under the Truth in Leasing Act, 49 U.S.C. § 14704, for providing and entering into leases with Plaintiffs and putative class members which violated the provisions of that Act.

10.     This case also seeks redress under Tennessee common law for breach of contract for Defendants' failure to pay Plaintiffs the cents per mile revenue they were promised in their contracts.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred upon this Court by 29 U.S.C. § 216(b) of the Fair Labor Standards Act, by 28 U.S.C. § 1331, this action arising under laws of the United States, by 28 U.S.C. § 1332(d) of the Class Action Fairness Act, and by 28 U.S.C. § 1337, this action arising under Acts of Congress regulating commerce. Jurisdiction over Plaintiffs' claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

12.     Plaintiffs' claims involve matters of national or interstate interest.

13.     The matter in controversy in the aggregate exceeds the sum or value of $5,000,000

exclusive of interests and costs.

14.     Members of the proposed Class are citizens of States different from the Defendants.

15.     Named Plaintiff Elmy is a citizen of Colorado.[2]

16.     Named Plaintiff Gerald Biernot is a citizen of South Carolina.

17.     Named Plaintiff Derrotis Holmes is a citizen of Florida.

18.     Upon information and belief, members of the proposed Class are citizens of all 50 states and the District of Columbia.

19.     Defendants are citizens of Tennessee, Nevada and Iowa.

20.     Defendants conduct business in this District. Defendants are headquartered within the Middle District of Tennessee. Defendants' main terminal (out of seven terminals in the United States) is located in Nashville, Tennessee, within the Middle District of Tennessee. Defendant employs terminal managers and dispatchers in the Middle District of Tennessee. Defendant maintains facilities in the Middle District of Tennessee at which lease operators can have repairs and maintenance performed on their trucks, park their trucks, and park their trailers for swapping out loads.

21.     Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District, and at least one Defendant resides in this District.

## PARTIES

**A.      Plaintiffs**

22.     Plaintiff John Elmy is a natural person residing in Sterling, Colorado.

23.     Plaintiff Gerald Biernot is a natural person residing in Myrtle Beach, South Carolina.

---

[2] At the time of filing of the initial Complaint and the First Amended Complaint, Plaintiff Elmy was a citizen of Georgia.

4

24.     Plaintiff Derrotis Holmes is a natural person residing in Tallahassee, Florida.

25.     Plaintiffs leased trucks from Defendants and signed Defendants' form Agreements.

26.     As a matter of law, Plaintiffs were employees of Defendants as described herein. Plaintiffs worked for Defendants in Tennessee and other states.

27.     Plaintiffs were engaged in commerce in their work for Defendants.

28.     Plaintiffs bring claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, individually and on behalf of a collective action class as further described herein.

29.     Plaintiffs also bring claims under Tennessee common law for fraud and negligent misrepresentation, breach of contract, contract unconscionability, and unjust enrichment, under the Federal Forced Labor statute, 18 U.S.C. §§ 1589 and 1595, and under the Truth in Leasing Act, 29 U.S.C. § 14704, individually and on behalf of a nationwide Class, under Fed. R. Civ. P. Rule 23, as further described herein.

**B.     The FLSA Collective Action Class**

30.     The term "Plaintiff" or "Plaintiffs" as used in this Complaint refers to the Named Plaintiffs and any additional represented Collective Action Class Members pursuant to the collective action provision of 29 U.S.C. § 216(b). The Named Plaintiffs bring this case under the collective action provision of the FLSA as set forth in 29 U.S.C. § 216(b) on behalf of themselves and a class of persons throughout the U.S. consisting of "all truckers who lease a truck from New Horizons Leasing, Inc. to drive for Western Express, Inc. during the three years preceding the filing of the initial complaint and up through the date of final judgment herein and subject to any equitable tolling for any applicable portion of the limitation period."

31.     Excluded from any Collective Action Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during

5

the class period has had, a controlling interest in any Defendants.

**C.    The Rule 23 Class**

32.    The Second through Eighth Causes of Action are properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3). There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members of the Class and that will be resolved by common answers including but not limited to:

a.    Whether Defendants are or were Plaintiffs' employers;

b.    Whether Defendants intentionally misrepresented material facts about the Owner Operator program to mislead drivers into becoming Owner Operators;

c.    Whether Defendants recklessly represented material facts about the Owner Operator program without knowing whether they were true;

d.    Whether Defendants failed to exercise reasonable care or competence in obtaining or communicating information about the Owner Operator program to drivers;

e.    Whether Plaintiff lease operators conferred a benefit upon Defendants by acting as Defendants' de facto employees while being classified by Defendants as independent contractors;

f.    Whether Defendants were aware of such benefit;

g.    Whether Defendants' acceptance of such benefit under the circumstances would be inequitable for them to retain the benefit without payment of the value thereof;

h.    Whether the terms of the Agreements Plaintiffs had to sign to become lease operators were so unequal as to shock the judgement of a person of common sense;

i.    Whether the provisions of the Agreements Plaintiffs had to sign to become lease operators were so one-sided, in view of all the facts and circumstances, that Plaintiffs

6

were denied any opportunity for meaningful choice;

j.  Whether Defendants knowingly obtained Plaintiffs' labor by means of threats of serious financial and reputational harm;

k.  Whether the leases violated the provisions of the Truth in Leasing Act;

l.  Whether Defendants breached the Contract Hauling Agreements by failing to pay Plaintiffs the mileage revenue specified therein;

m.  The nature and extent of Class-wide injury and the appropriate measure of damages for the Class.

33.  The claims of the Named Plaintiffs are typical of the claims of the Class they seek to represent. The Named Plaintiffs and the Class members work or have worked for Defendants and have been subjected to a common policy, practice and scheme that:

a.  Induces Plaintiffs to become Owner Operators by misrepresenting material facts about the Owner Operator program;

b.  Requires Plaintiffs to sign an unconscionable Lease and Contract on a "take-it-or-leave-it" basis;

c.  Requires Plaintiffs to sign Leases which violate the protections of the Truth in Leasing Act;

d.  Unjustly enriches Defendants by allowing them to control Plaintiffs like employees while shifting all risk and expenses onto Plaintiffs and depriving them of federal and state protections for employees;

e.  Forces Plaintiffs to work for Defendants for long periods of time under threat of serious financial and reputation harm.

f.  Fails to pay Plaintiffs the cents per mile mileage revenue set forth in their Contract

7

Hauling Agreements;

34.     Defendants acted and refused to act on grounds generally applicable to the Class, thereby

making declaratory relief with respect to the Class appropriate.

35.     The Named Plaintiffs will fairly and adequately represent and protect the interests of the

Class.

       g.     The Named Plaintiffs understand that, as class representatives, they assume a

          fiduciary responsibility to the Class to represent its interests fairly and adequately.

       h.     The Named Plaintiffs recognize that as class representatives, they must represent and

          consider the interests of the Class just as they would represent and consider their own

          interests.

       i.     The Named Plaintiffs understand that in decisions regarding the conduct of the

          litigation and its possible settlement, they must not favor their own interests over

          those of the Class.

       j.     The Named Plaintiffs recognize that any resolution of a class action lawsuit,

          including any settlement or dismissal thereof, must be in the best interests of the

          Class.

       k.     The Named Plaintiffs understand that to provide adequate representation, they must

          remain informed of developments in the litigation, cooperate with class counsel by

          providing them with information and any relevant documentary material in their

          possession, and testify, if required, in a deposition and in trial.

36.     The Named Plaintiffs have retained counsel competent and experienced in complex class

action employment litigation.

37.     A class action is superior to other available methods for the fair and efficient adjudication

of this litigation - particularly in the context of wage litigation like the present action, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against one of the larger truckload carriers in the United States. The members of the Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures. In addition, class treatment is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

**D.      Defendants**

38.      Upon information and belief, Defendants Western and New Horizons are related business corporations having an office and place of business in Tennessee.

39.      Defendant Western is a privately owned Nevada corporation with its principal office address at 7135 Centennial Place, Nashville, TN 37209.

40.      Defendant Western is a motor carrier, engaged in interstate shipment of freight.

41.      Defendant New Horizons is a privately owned Iowa corporation with its principal address at 7135 Centennial Place, Nashville, TN 37209.

42.      Defendant New Horizons has an office and place of business at the very same location as Western.

43.      Defendant New Horizons is related to Western. It leases trucks to truckers who will drive for Western. It requires truckers who sign Leases to sign Contracts with Western.

44.      Defendant New Horizons leases trucks to Western lease operators for the purpose of helping Western further its shipping business.

45.      Upon information and belief, Defendants Western and New Horizons are owned and operated by same people, including Paul Wieck and Richard Prickett.

46.      Upon information and belief, Defendants Western and New Horizons have other

9

interlocking and overlapping officers and directors.

47.     Defendants John Doe 1 through John Doe 5 are presently unknown persons who, directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices of Defendants Western and New Horizons which resulted in Defendants' failing to pay Plaintiffs proper compensation pursuant to the FLSA and Tennessee state laws.

48.     John Does 1-5 are jointly and individually liable for Defendant Western's failure to compensate Plaintiffs at least the federal minimum wage for all hours worked because they directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices which violated the FLSA.

49.     Defendants Western and New Horizons conduct business throughout the country.

50.     Upon information and belief, Defendants Western and New Horizons each grossed more than $500,000 in each of the last three calendar years, individually and collectively.

51.     Defendants Western and New Horizons are enterprises engaged in interstate commerce for purposes of the Fair Labor Standards Act.

52.     Defendants Western and New Horizons have common control and a common business purpose and are operated as a single enterprise, within the meaning of 29 U.S.C. § 203(r)(1).

53.     All actions and omissions described in this complaint were made by Defendants directly or through their supervisory employees and agents.

## FACTUAL BACKGROUND

### A.     Fraud and Misrepresentation About the Owner Operator Program

54.     Through Western's website, Defendants have regularly and repeatedly misrepresented to drivers that they will earn over $225,000 annually. On its "Owner Operator" page, Defendants' website states "CDL Truck Driver; $225,000+ Annually; Upgrade To Independence!"

10

55.     With specific respect to the Lease Program, Defendant has published and operated a website from August 2014 through the present which states that drivers who participate in the lease program receive an average of 2400-2700 miles per week.

56.     Additionally, from on or around August 15, 2014 through at least August 2015, Western Express stated, on its publicly accessible website, that the average cents per mile received was $1.45 to $1.90, that customers paid a fuel surcharge on top of the cents per mile for all loaded miles, that the weekly payment for the lease program could be as low as $390, and that the average miles per week were 2400-2700, thereby stating that the driver in the lease program would receive an average of $222,105 per year in annual revenue, with additional amounts provided for fuel as part of fuel surcharges, and that the lease payments for a year could be as little as $20,280.

57.     After August 2015, Western Express no longer stated that the weekly payment for the lease could be as low as $390, but instead that the lease payment would be one low all-inclusive weekly payment; Western continued to make the remaining representations set forth in Paragraph 56.

58.      From January 2017 through at least June 2017, Western Express made similar representations on its website explaining the lease program, stating that the drivers would average 2400-2700 miles, had a weekly take home potential of $1250-$1550 or more; that the average cents per mile paid was $1.45 to $1.85 (thereby suggesting average annual revenue for a driver of $218,790), and that the all-inclusive weekly lease payments started under $400.

59.     From October 23, 2017 through present, Western Express operated the same website with minor variations, the most important being that Western Express now advertised that drivers could "earn up to $175,000/YR".

60. Defendants made and continue to make the same statements and representations through Facebook posts and advertisements posted on Defendants' Facebook page at various times in the last five years, at https://www.facebook.com/drivewithwestern/, and their Facebook page for their lease program, https://www.facebook.com/WesternExpressLeasePurchase.

61. Defendants made and continue to make the same statements and representations in online job ads posted throughout the country, including on craigslist.com, indeed.com, lensa.com, cdljobnow.com, helpwanted.com, rhodeislandgreen.com, ziprecruiter.com, and, on information and belief, other websites.

62. The statements and claims Defendants made about the lease program on their Facebook pages, online job boards, and elsewhere, continuously over the last five years, were the same or materially identical statements detailed in Paragraphs 54 to 59, though the specific numbers and statistics related to average miles, average take-home pay, and average cents per mile may have sometimes varied in small amount.

63. Immediately prior to drivers signing the Contract and Lease, Western's staff make uniform oral representations to the potential lease operators that while they are in the Owner Operator program, (a) the drivers will be able to take home time whenever they want; (b) they will have their choice of loads; (c) they will receive the best loads; and (d) Western will keep them moving, i.e., keep them loaded and/or under dispatch.

64. Defendants make the misrepresentations and false statements detailed in Paragraphs 54 through 63 knowing they are false or make such misrepresentations recklessly, knowing that there is insufficient knowledge upon which to base such a representation, or make such misrepresentations without exercising reasonable care or competence in communicating the information to potential Owner Operators.

12

65.     Defendants make such misrepresentations to drivers in order to deceive them and induce

them to become Owner Operators because Owner Operators are more profitable to Defendants

than company drivers. As opposed to company drivers, Defendants can then shift virtually all of

their business expenses and business risk to the Owner Operators; coerce Owner Operators into

remaining with Western for long periods of time under threat of serious financial harm, and

avoid compliance with federal and state protections for employees, such as Title VII, FMLA,

NLRA and wage protection statutes such as the FLSA and similar state laws.

66.     By misclassifying Owner Operators, Defendants also avoid paying payroll taxes, such as

Social Security, FUTA, etc., on the wages the Owner Operators earn and shift their tax burdens

obligations onto Owner Operators.

67.     Drivers, including Plaintiffs, reasonably and justifiably relied on these representations by

Defendants, having no reason to know that such representations were false, and signed Leases

and Contracts with Defendants to become Owner Operators.

68.     Upon information and belief, the vast majority of lease operators, including Plaintiffs, did

not earn in excess of the annual earnings that Defendants regularly represented owner operators

would earn. In many weeks they earned less than the minimum wage and negative balances in

weeks when their expenses exceeded their earnings. Upon information and belief, average

earnings for owner operators are far less than what Defendants represented they would earn

annually. Indeed, upon information and belief, even average annual revenues—prior to deducting

expenses—are far less than what Defendants' represented. Likewise, upon information and

belief, the vast majority of lease operators, including Plaintiffs, did not receive the promised

average cents per mile pay rate. Finally, upon information and belief, the vast majority of lease

operators did not average 2400-2700 miles per week.

69.     Defendants possesses all financial data necessary to know that its representations concerning earnings are false, and at all times it was making these representations (i.e., from August 2014 through the present), Defendants' management reviewed data on a regular basis and knew the vast majority of drivers were not receiving either miles or pay anywhere consistent with Defendants' representations.

70.     Upon information and belief, Defendants misrepresented to Plaintiffs that they were independent contractors despite knowing or recklessly disregarding that Owner Operators were in fact employees under the law. Defendants reaped additional profits at the expense of Plaintiffs through the misrepresentation.

71.     Plaintiff lease operators suffered damages and financial losses including loss of wages as a result of their reliance on Defendants' false representations and their subsequent action of becoming lease operators.

**B.     Procedural and Substantive Unconscionability of the Lease and Employment Contract**

72.     Western and New Horizons present the Plaintiff lease operators with an integrated series of pre-printed forms, the Equipment Lease ("Lease") and Contract Hauling Agreement ("Contract"), referred to herein collectively as "Agreements," to lease Plaintiffs trucks owned by Defendants and purporting to create an independent contractor relationship.

73.     Western and New Horizons provide the Agreements on a "take-it-or-leave-it" basis that must be signed at the time they are provided to the Plaintiffs.

74.     Plaintiffs who signed a Lease with New Horizons were required to simultaneously sign a Contract with Western. The New Horizons Lease and Western Contract are part of a package that drivers are required to sign in toto to become Owner Operators.

75.     Lease operators are not provided with a hard copy of the Lease and Contract, but instead

are sent an electronic copy to their cell phones. Lease operators are made to sign the Lease and Contract "then and there" on Defendants' premises. Only once they have signed the Lease and Contract are they given a hard copy of the documents.

76.     In many cases, lease operators are made to review the Agreements at locations far from their home, with no practical way home, other than by signing the Agreements in order to lease the truck as a means of transportation.

77.     Defendants prevented Plaintiffs from driving their leased trucks for any other trucking companies, yet Defendants do not guarantee any amount of work to Plaintiffs.

78.     The Contracts allow Western to terminate lease operators' Contracts, with or without cause, on 10 days' written notice.

79.     Upon information and belief, Western regularly terminates lease operators' Contracts without 10 days' written notice.

80.     The Contract requires Plaintiffs to arbitrate all disputes arising out of the Contract, but reserves for Defendants the right to seek redress in a judicial forum for various claims they might have against Plaintiffs.

81.     The New Horizons Lease requires that lease operators sign a contract with Western and authorize Western to deduct and pay New Horizons any amounts due to New Horizons from lease operators' pay.

82.     The New Horizons Lease allows New Horizons to treat a lease operator as in "default" of the lease for numerous reasons including but not limited to if (a) he or she does not make a lease payment when due; (b) the lease operator breaches any provision of the lease (including not having a Contract with Western/driving for another company) or any agreement between the lease operator and any affiliate of New Horizons (including the Contract with Western); (c) the

lease operator ceases to do business as a going concern; or (d) the lease operator carries a negative settlement balance with New Horizons for more than 10 days.

83.     If a lease operator is put in "default" by New Horizons, Defendants take possession of the truck, thereby depriving lease operators of their means of livelihood, and claim "liquidated damages" under a provision that guarantees all remaining Lease payments (which can be a hundred thousand dollars or more). This is so even though Defendants' own unilateral conduct of terminating the Contract or depriving lease operators of loads may have caused the "default." The Lease allows for liquidated damages despite the fact that any actual losses to New Horizons are capable of determination and mitigation through re-leasing the truck, and that any losses are far less than Defendants unreasonable liquidated damages. Even more onerous to the lease operators is that, in addition to liquidated damages, the Lease provides for acceleration of all remaining Lease payments upon default.

84.     This allows Western to exercise almost complete control over lease operators because if lease operators do not comply with Western's demands, Western can simply terminate the Contract or refuse to give lease operators loads, forcing them into default with New Horizons, and the subsequent crushing financial consequences.

85.     Although the Agreements allow for lease operators to terminate these Contracts, lease operators are not free to do so because lease operators would be deemed in "default" of their Leases, leading to the same severe financial and reputational consequences for lease operators as if Defendants had terminated the Agreements.

86.     Furthermore, if Defendants characterize a lease operator as in "default" for any reason, Defendants report lease operators' amounts due to credit reporting agencies (thereby impeding lease operators' ability to work for other carriers) and report lease operators' "default" to

16

HireRight for inclusion on the lease operators' "Drive-A-Check" ("DAC") report, an employment history report that the trucking industry uses to make hiring decisions (thus seriously impeding or denying their ability to obtain future employment).

87.    The Lease and Contract are unconscionable because, among other things, they are presented to Plaintiffs on a "take-it-or-leave-it basis" with no opportunity for Plaintiffs to negotiate any of their terms, and because the terms are so oppressive that no reasonable person would make them and no honest and fair person would accept them.

**C.    Misclassification of Plaintiff Lease Operators as Independent Contractors/ Minimum Wage Violations**

88.    Despite the characterization of lease operators as independent contractors, Western exercises virtually the same control over lease operators as it does over its employee drivers.

89.    The Defendants' characterization of Western's employee workforce as independent contractors is the centerpiece of a labor scheme crafted to allow Western to charge its lease operators for the opportunity to work, shift virtually all of its business expenses and business risk to its lease operators, coerce lease operators into remaining with Western for long periods at a time under threat of serious financial harm; defeat all federal and state protections for employees, such as Title VII, FMLA, NLRA and wage protection statutes such as the FLSA and similar state laws. By misclassifying lease operators, Defendants also evade their obligation to pay payroll taxes such as Social Security and FUTA and shift tax burdens onto the Plaintiff lease operators.

90.    Although there is language in Defendants' Contract that appears to permit Plaintiffs to work for other trucking companies, in fact, Defendants' Lease provides that Plaintiffs must have a Contract with Western Express.

91.    The Agreements also implicitly provide that a lease operator cannot haul freight for another carrier without terminating the Agreements with Defendants. The Contract states that a

17

lease operator must remove all Western identification and documentation from the leased truck before hauling for another carrier, or Defendant Western can withhold the lease operator's final settlement, implying that once a lease operator hauls for another carrier, he no longer hauls for Defendant Western and is given his final settlement. The Lease also requires lease operators to have a contract with the Carrier reflected in Schedule A of the Lease (in Plaintiffs' case, that Carrier is Defendants Western). Failure to maintain such a contract is a default under the Lease.

92.     In addition, when signing the Agreements, Defendants repeatedly verbally emphasize that Plaintiffs cannot take the truck to another carrier.

93.     Defendants do not warranty the trucks that they lease to Plaintiffs and do not guarantee Plaintiffs any amount of work.

94.     Defendants jointly control Plaintiffs' work and, by law, employ Plaintiffs to transport goods by truck for Western's customers. Defendants control and monitor when, where, and how Plaintiffs deliver freight. They assign loads one at a time to Plaintiffs, who must accept the load assignment or face punishment. Defendants also control and monitor the equipment that Plaintiffs use, including, its operation, maintenance, and condition. Defendants control the number and type of loads that are offered to Plaintiffs, thereby controlling how much money they can make. Defendants attach a "speed governor" to the trucks they lease to Plaintiffs, so that Western even monitors and controls the speed at which Plaintiffs may drive. Defendants monitor and control virtually every aspect of Plaintiffs' performance of Western's work and the equipment that Plaintiffs use for that work.

95.     Even though Defendants act as Plaintiffs' employers by law, Defendants benefit greatly by misclassifying Plaintiffs as independent contractors. Plaintiffs fund Defendants' fleet inventory. Defendants charge Plaintiffs tens of thousands of dollars per year for the lease of

Defendants' trucks, and they also require Plaintiffs to pay for other equipment, gas, tolls, insurance, bonding, repairs and maintenance, among other items. Defendants charge Plaintiffs directly for a wide variety of employer expenses including the truck being used for Defendants' business purpose, the Qualcomm device by which Defendants send instructions to Plaintiffs, monthly Qualcomm administrative fees, liability insurance, (indemnifying Western and New Horizons), taxes, tolls, equipment, gas, truck maintenance, and a variety of other charges incurred for Defendants' benefit.

96.     Thus, while the Contract purports to permit Plaintiffs to be independent contractors, Plaintiffs are compelled to work only for Western during the terms of their contracts, doing the primary work that Western performs in the market – hauling of goods for Western's customers.

97.     By the Agreements, Defendants force Plaintiffs to bear Defendants' business expenses. Defendants require Plaintiffs to pay for the truck being used for Defendants' business purpose, the Qualcomm device by which Defendants send instructions to Plaintiffs, monthly Qualcomm administrative fees, liability insurance, (indemnifying Western and New Horizons), taxes, tolls, equipment, gas, truck maintenance, and a variety of other charges, including those designed solely to cover Defendants' administrative expenses and Defendants' profit.

98.     Defendants (or agents arranged by Defendants) handle the administration of taxes, licensure, registration, bonding, insurance, tolls, gas, and accounting related to Plaintiffs' trucks, for Defendants' own protection, but pass along all these costs (generally with a markup for profit) to the Plaintiffs.

99.     Plaintiffs are required to pay money to Defendants for a security deposit account. Under the Contract, Defendants are authorized to deduct from the account the various expenses that they have shifted to Plaintiffs in the event that Plaintiffs do not pay them, including for vehicle

licenses, insurance, loss or damage to cargo, personal injury or property damage, parts or service, administrative costs, taxes, failure to properly or timely deliver freight, Qualcomm leasing, loss or damage to Western-owned trucks, and fines or penalties.

100.    Defendants' scheme as described herein shifts virtually all of the costs of maintaining Western's fleet and general business operations to Plaintiffs, but keeps all the benefits. This scheme also shifts the risk of a downturn in the trucking business from Defendants to Plaintiffs, since Defendants are not obligated to give Plaintiffs any specific amount of work.

101.    Western fails to pay the wages required by law free and clear to the Plaintiff employees.

102.    Instead, Western calculates the pay for Plaintiffs by a weekly accounting that makes deductions from the mileage pay due to Plaintiffs for the various business expenses it and New Horizons shifts to Plaintiffs. Additionally, Plaintiffs are made to bear Defendants' business expenses out of their own pockets. Such expenses constitute *de facto* deductions from Plaintiffs' pay.

103.    In many weeks, the deductions from Plaintiffs' pay yield wages well below federal minimum wage guarantees. In many weeks lease operators have negative balances, i.e., they owe Defendants more in expenses than Defendants pay them. Thus, Defendants failed to pay Plaintiff the minimum wage for each hour worked.

**D.    Unjust Enrichment of Defendants by Plaintiffs Due to Employee Misclassification**

104.    Lease operators conferred a benefit on Defendants by acting as employees, but being misclassified as independent contractors, as they fulfilled the primary business in which Defendants engage and were controlled by Defendants but had to bear employment-related expenses and were not subject to all federal and state protections for employees. Defendants knew of these benefits. Nevertheless, they misclassified lease operators so they could avoid their

obligations to lease operators as employees and shift the expenses of Defendants business onto those employees. By accepting the services of these employees but misclassifying them as independent contractors, Defendants caused lease operators to lose wages, incur negative settlements, and suffer other damages. Such circumstances make it inequitable for Defendants to retain the benefits of lease operators' employment without paying them for the value of such employment conferred.

105.    The Contract between Owners Operators and Defendants is unenforceable for many reasons including, among other things, unconscionability. Thus, lease operators, including Plaintiffs, do not have an adequate remedy at law and are entitled to the equitable remedy of unjust enrichment.

106.    By misclassifying Plaintiff lease operators as independent contractors, Defendants obtain a vast competitive advantage over competitor trucking companies that treat their lease operators as employees in compliance with the law. Defendants' pay practices drive down trucker wages across the industry and undercut fair labor practices across the country.

**E.    Forced Labor/Involuntary Labor Servitude of Plaintiffs Under Threat of Financial Harm**

107.    Defendants force Plaintiffs to labor for them for long periods of time, under terms that employees would never be bound to follow. The Lease states that, among other things, if the lease operator does not make a lease payment when due, breaches any provision of the Lease or Contract, or carries a negative settlement balance for more than 10 days, Defendants will treat the lease operator as in "default." Upon a "default" Defendants may repossess the leased truck, accelerate all remaining lease payments, thereby imposing crushing debt on the lease operator, ruin the lease operator's credit rating, and file a negative entry on the Plaintiff lease operator's "DAC Report" which is universally used in the trucking industry as a pre-employment screening

21

tool, thereby making it virtually impossible to obtain work as a truck driver again. Defendants

may also proceed by court action to enforce performance of the Lease or recover any damages

for breach of the lease, though lease operators are forced to arbitrate any disputes.

108.    Under the Lease, Defendants can also recover as liquidated damages all expenses of

retaking, holding, preparing for sale, and selling the truck. Defendants can also recover as

liquidated damages attorney's fees and other legal expenses.

109.    Even though Plaintiffs are tied to working for the Defendants for long periods of time,

Western reserves the right to terminate its Contract with Plaintiffs at any time it chooses, which

is contractually defined as a "default" of New Horizons's Lease by the lease operators. Upon

characterizing the Defendants' acts as a lease operator's default, Defendants immediately

repossess the truck and also accelerate the remaining Lease payments and New Horizons's lost

profits which become immediately due and owing. Since a lease for a new truck can cost a

Plaintiff over $100,000, Defendants have the unilateral power to subject Plaintiffs to crushing

financial consequences, for any reason or for no reason at all.

110.    Thus, upon termination of the Contract, Defendants claim they may reap windfall profits,

further penalize Plaintiffs, and even prevent Plaintiffs from earning a living using the leased

truck – the essential tool of Plaintiffs' trade -- while concurrently demanding excessive and

unreasonable liquidated damages upon "default."

111.    Defendants' ability to put Plaintiffs in default of the Lease at any time provides

Defendants with further means to maintain exclusive control over the lease operators' work, and

forces lease operators to accept changes to the Contract or Lease imposed unilaterally by

Defendants and to work for less than the minimum wage.

112.    Thus, even though the Contract provides that either party may terminate the Contract,

22

Plaintiffs cannot reasonably do so, because to do so also would trigger a "default" of the Lease resulting in the same severe financial penalties as if Defendant had terminated the Contract.

113.    Plaintiffs are thereby forced to endure working under Defendants' exclusive control for leases lasting as long as three years, even when they are being paid sub-minimum wages, while Defendants on the other hand, may fire Plaintiffs at any time, while calling that termination a "default" by the lease operator, and even exact further profits from doing so.

114.    Defendants' scheme is designed to force the continued labor of Plaintiffs by using threats of serious financial and professional harm through explicit threats to impose, enforce, and collect significant debts, prohibit Plaintiffs from pursuing their profession by submitting negative entries on their DAC trucker employment report (so that other trucking companies will not hire them), and to report the "default" to credit bureaus so the lease operator's credit is destroyed and he or she will not be able to become a lease operator with another trucking company.

**F.    Truth in Leasing Act Violations**

115.    The foregoing paragraphs are incorporated herein as if set forth in their entirety.

116.    To help facilitate the interstate delivery of freight, Defendants entered into substantively identical Contracts and Leases with Plaintiffs.

117.    Under federal law and regulations, "authorized motor carriers" such as Defendant Western may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in the federal Truth-in-Leasing Regulations at 49 C.F.R. § 376.12. *See* 49 C.F.R. § 376.12(a).

118.    The Contracts and Leases do not conform to the requirements set forth in 49 C.F.R. § 376.12.

119.    By way of example, the Contract, attached as Exhibit A, contains several provisions that

23

violate the Truth in Leasing Regulations:

    a.      Paragraph 4 of the Contract violates 49 C.F.R. § 376.12(f) by stating that

Defendants can withhold a Contractor's final payments for 45 days in an escrow account,

when carrier is required to make payment 15 days after submission of the necessary

delivery documents are provided to the carrier, or until after the lessor removes all

identification devices or certifies that they have been lost, whichever is later;

    b.      Paragraph 4 of the Contract violates 49 C.F.R. § 376.12(d) by failing to clearly

specify the compensation that Plaintiffs will receive by stating that Defendants may

deduct "any other amounts due the Carrier" without clearly specifying what amounts may

be owed or how such amounts will be calculated.

    c.      Paragraph 4 of the Contract also violates 49 C.F.R. §§ 376.12(d) and (h) by

failing to specify the amount of fuel payments the driver is "kicking back" to Defendants

by virtue of fuel discounts which Defendants negotiate with fueling locations but do not

pass on to Plaintiffs or those similarly situated.

    d.      Paragraph 4 of the Contract also violates 49 C.F.R. § 376.12(h) by stating that the

contractor will be liable for collection costs of Defendants, but fails to specify how such

collection costs are calculated;

    e.      Paragraph 9 of the Contract violates 49 C.F.R. § 376.12(c)(1) by stating that

Defendants are not responsible for injuries which may occur to the Contractor, a

Contractor's assistant or employee, thereby unlawfully limiting Defendants' "complete

responsibility" for the operation of the equipment.

    f.      Paragraph 11 of the Contract violates 49 C.F.R. § 376.12(h) because it states that

Contractor will be liable for any shortage, loss, or damages caused directly or indirectly

by the operation of the Contractor, but fails to specify when a shortage, loss, or damage will be deemed to be **_indirectly_** caused by the driver.

g.　　Paragraph 16 of the Contract violates 49 C.F.R. § 376.12(h) by stating that the Contractor may be liable for costs to have another driver deliver a load, but fails to specify under what conditions Defendants will require a Contractor to relinquish a load, and fails to specify what the costs to Defendants would be, what the damages would or could be, and how such costs and/or damages would be calculated, and fails to specify that in the event of same, Defendants will provide Contractor with an itemization and explanation of the charges;

h.　　Paragraph 17 of the Contract violates 49 C.F.R. § 376.12(d) by stating that extra compensation may be provided, but failing to specify what such extra compensation might be and how it is calculated;

i.　　Paragraph 25 of the Contract violates 49 C.F.R. § 376.12(b) by failing to clearly specify the specific duration of the contract.

j.　　Paragraph 28 of the Contract violates 49 C.F.R. §§ 376.12(d) and (h) by providing that disputes about the settlement—including compensation and chargebacks—will become final and non-susceptible to challenge if not challenged in writing within 15 days—even if such payments/deductions are substantively incorrect or are unexplained.

k.　　Schedule I of the Contract violates 49 C.F.R. § 376.12(d) by misstating how Defendant actually pays drivers, by stating that drivers would receive three different mileage rates (0-200 miles = $2.50/mile; 201-400 miles = $1.15/mile; 401+ miles = $0.95/mile) per mile driven (such that the first two hundred miles of a 350-mile trip are paid at $2.50/mile, and the remaining miles paid at $1.15/mile), where Defendant instead

25

paid the same cents per mile rate for all miles driven in each trip, based on the rate due for the last mile of the trip.

l.      Schedule I of the Contract violates 49 C.F.R. § 376.12(d) by failing to clearly specify compensation, insofar as it states that accessorial charges, many of which are undefined, will be paid at an "average rate" but failing to specify how that average is calculated.

m.      Schedule II, Sections 1 of the Contract violates 49 C.F.R. § 376.12(h) by failing to specify how specific deductions and charges to the Contractor will be calculated, including but not limited to loans made by Carrier to Contractor, amounts due by failing to make proper collection, the trailer relocation charge, and other deductions. By way of example, the $2500 Trailer Relocation Charge refers to a Paragraph 29 of the Contract Hauling Agreement, which does not exist.

n.      Schedule II, Section 2(A)-(B) of the Contract violates 49 C.F.R. § 376.12(k)(2) by specifying the creation of an escrow account but does not specifically state the items that this escrow account may be applied to, in violation of 49 C.F.R § 376.12(k)(2).

o.      Schedule II, Section 2(A)-(B) of the Contract violates 49 C.F.R. § 376.12(k)(6) by purporting to give Defendants the right to withhold Plaintiffs' escrow funds for longer than 45 days from the date of termination;

p.      Schedule II, Section 2(A) violates 49 C.F.R. § 376.12(k) by making $5000 of the escrow account a security deposit forfeited by the driver upon termination of the contract;

q.      Schedule II, Section 2(B) violates 49 C.F.R. § 376.12(k) by allowing Defendants to deduct from the maintenance escrow monies unrelated to the maintenance of the vehicle, thereby creating not a lawful maintenance escrow fund but instead an unlawful

"general fund to satisfy any obligations incurred." *See OOIDA v. Artic Exp. Inc,* 159 F.

Supp. 2d 1067 (S.D. Ohio 2001).

120.    Additionally, the Contract violates the Truth in Leasing Act by failing to contain the

required provisions:

    a.    Failing to contain an unqualified statement of Defendants' exclusive possession,

use, and control of the equipment, in violation of 49 C.F.R. § 376.12(c)(1);

    b.    Failing to state that Contractors may review documents from which rates and

charges may be computed, in violation of 49 C.F.R. § 376.12(g).

121.    Additionally, the Equipment Lease, which is incorporated by and operates in unity with

the Contract, violates the Truth in Leasing Act by containing the following provisions:

    a.    Paragraph 9 requires maintenance on the vehicle to only be performed by vendors

pre-approved by Defendant New Horizon, thereby constituting a forced purchase in

violation of 49 C.F.R. § 376;

    b.    Paragraph 9 violates 49 C.F.R. § 376.12(k) by requiring that funds remaining in

the maintenance escrow account at the time the lease is terminated be used to pay either

the remaining amounts due under the lease OR as an early termination fee if the

Contractor terminates the vehicle lease prior to end of the lease;

    c.    Paragraph 23 violates 49 C.F.R. § 376.12(k) by requiring that funds held as a

security deposit be non-refundable if the Contractor does not complete the lease;

    d.    Paragraph 29 violates 49 C.F.R. § 376.12(h) as it relates to specificity of

chargebacks, as it states that Defendant New Horizon can charge relocation costs for

failing to return the trailer to Nashville, TN, at the termination of the lease, including an

extra 20% for expenses, but fails to explain how any such costs or additional expense

27

amounts would be calculated.

122.     Additionally, the Qualcomm Usage Fee specified, by way of example, in the Tractor

Package Breakdown addendum to Named Plaintiff Elmy's lease is a forced purchase from the

carrier in violation of 49 C.F.R § 376(i).

**G.     Breach of Contract with respect to the Compensation Schedule**

123.     Defendants failed to pay Plaintiffs the cents per mileage revenue specified in their

Contracts.

124.     For instance, in the Contract Hauling Agreement, attached as Exhibit A, Defendants

agreed that Plaintiff Elmy would receive a mileage rate of $2.50/mile for 0-200 miles driven,

$1.15 per mile for the 201-400 miles driven, and $0.95 cent per mile for miles driven over 400

miles.

125.     Defendants failed to pay Plaintiff Elmy the mileage rate it agreed to in the Contract

Hauling Agreement.

126.     By way of example, on December 15, 2016, Plaintiff Elmy received a settlement

statement, attached as Exhibit B, which specified that payment for three loads, with the

following order numbers, miles driven, rates, and gross revenue (before deductions, many of

which Plaintiffs allege are unlawful):

        a.      Order 6063566; Loaded: 360; Empty: 137; Rate: $0.95; Revenue:  $472.15

        b.      Order 6079391; Loaded Miles: 1043; Empty: 78; Rate: $0.95; Revenue: $1064.95

        c.      Order 6111014; Loaded Miles: 957; Empty: 86; Rate: $0.95; Revenue: $990.85

127.     The Settlement Statement accordingly sets forth that Plaintiff Elmy received mileage rate

revenue of $2527.95, for 2661 miles, or $0.95 revenue per mile.

128.     However, under the terms of Elmy's Contractor Compensation Addendum to the

Contract, Elmy should have received mileage revenue of $798.40 for the first Order ((200 miles * $2.50) + (200 miles * $1.15) + (97 miles * $0.95)), $1414.95 of mileage revenue for the second Order, and $1340.85 mileage revenue for the third Order, for total mileage revenue for these three orders of $3577.95, an average cents per mile rate of $1.34.

129.     The average cents per mile rate for this week that Elmy should have received is more consistent with Defendant's representations that in 2016, the average cents per mile earned by lease operators was $1.45 to $1.90, as set forth above in Paragraph 56.

130.     Defendant also failed to pay other Lease Operators, including Plaintiffs, the cents per mile revenue specified in their Contract Hauling Agreements.

**H.     Individual Plaintiff Facts**

**Plaintiff John Elmy**

131.     Plaintiff Elmy began working for Western as a company driver in 2011. He worked for Western as a company driver for approximately two years and then left Western to drive for another company as a company driver.

132.     In or around January or February 2016, Plaintiff Elmy saw a Facebook advertisement for Western's Owner Operator program. The advertisement made representations about how much money he would make and how many miles he would run as an Owner Operator consistent with the Statements set forth in Paragraphs 56-57.

133.     Relying on those representations, Plaintiff Elmy applied for the program. He was notified by Western that he was approved and was sent a one-way bus ticket to Nashville, Tennessee.

134.     At that time, a friend of Plaintiff Elmy told him that he was also interested in being a lease operator for Western Express so the two of them decided to run as a team.

135.     When Plaintiff Elmy arrived at Western's headquarters in or around February 2016, he

29

was taken into a room with other potential lease operators where an employee of Western spoke and made representations to them about the Owner Operator program including, but not limited to, that he could take home time whenever he wanted, that he would get his choice of loads, that Owner Operators were given the best loads, and that Western would keep him moving.

136.    Plaintiff Elmy relied on Western's representations about the Owner Operator program in deciding to sign a Lease and Contract.

137.    In reliance upon Western's representations, Plaintiff Elmy signed a Lease and Contract on or about February 12, 2016.

138.    Though Plaintiff Elmy and his friend wanted to drive as a team, Western required one person to sign the Contract and Lease and "hire" the other person as a co-driver. Western had to approve the co-driver. Plaintiff Elmy and his friend decided that Plaintiff Elmy would sign the Contract and Lease and "hire" his friend.

139.    Defendants sent Plaintiff Elmy the Lease and Contract on his cell phone, and Plaintiff Elmy signed the Lease and Contract through his cell phone.

140.    Plaintiff Elmy requested a paper copy of the Lease and Contract and was told that he would get a paper copy only after he signed them. Plaintiff Elmy was not provided with a paper copy of the Lease and Contract until after he signed them.

141.    Plaintiff Elmy was not allowed to negotiate any of the terms of the Lease or Contract, including who to lease the truck from. Plaintiff Elmy was required to lease a truck from New Horizons. Defendants told Plaintiff Elmy that he had to sign the documents immediately.

142.    Plaintiff Elmy did not make $225,000 annually as a lease operator.

143.    In some weeks for work, Plaintiff Elmy did not make any earnings at all, and was treated by Defendants as owing them money for the work he performed for their benefit.

144.    Defendants told Plaintiff Elmy that he had to accept all loads assigned to him or it would be deemed a service failure, which is a basis for terminating the contract.

145.    Plaintiff Elmy was never given a choice of loads, but was instead assigned a single load at a time that he was required to accept.

146.    Defendants told Plaintiff Elmy that he could not use his leased truck to haul loads for other carriers.

**Plaintiff Gerald Biernot**

147.    Plaintiff Biernot began working for Western as a lease operator in July 2019.

148.    Prior to applying to become a lease operator, Plaintiff Biernot saw a job posting for Western's Owner Operator program on Indeed.com. The job posting made representations about how much money he would make and how many miles he would run as an Owner Operator consistent with the Statements set forth in Paragraphs 58-59.

149.    At the time, it was important for Plaintiff Biernot to stay relatively close to his home for personal reasons. Plaintiff Biernot spoke to a recruiter for Defendants and the recruiter told him that Defendants did not have forced dispatch and that he would be able to choose his loads.

150.    Relying on those representations, Plaintiff Biernot applied for the program. He was notified by Western that he was approved and went to Nashville, Tennessee, for orientation.

151.    During the orientation, an employee of Western spoke and made representations to him and the other drivers about the Owner Operator program including, but not limited to, that there would be no forced dispatch, that he would be given at least 2,800 miles per week, and that he would make at least $1,500 per week.

152.    Plaintiff Biernot relied on Western's representations about the Owner Operator program in deciding to sign a Lease and Contract.

31

153.    In reliance upon Western's representations, Plaintiff Biernot signed a Lease and Contract in or about July 2019.

154.    Plaintiff Biernot was not allowed to negotiate any of the terms of the Lease or Contract, including who to lease the truck from. Plaintiff Biernot was required to lease a truck from New Horizons. Defendants told Plaintiff Biernot that he had to sign the documents immediately.

155.    Plaintiff Biernot did not make the money or get the miles Defendants represented to him in the job posting or at orientation.

156.    In some weeks for work, Plaintiff Biernot did not make any earnings at all, and was treated by Defendants as owing them money for the work he performed for their benefit.

157.    Plaintiff Biernot was never given a choice of loads, but was instead assigned a single load at a time that he was required to accept.

158.    Defendants told Plaintiff Biernot that if he did not accept the load assigned to him, he would be forced to "sit" without a load, possibly for days.

159.    Defendants told Plaintiff Biernot that he could not use his leased truck to haul loads for other carriers.

**Plaintiff Derrotis Holmes**

160.    Plaintiff Holmes began working for Western as a company driver in or about October 2017. He worked for Western as a company driver for approximately five months and then left Western to drive for another company as a local dump truck driver.

161.    Prior to applying to become a lease operator, Plaintiff Holmes saw an advertisement on Craigslist for Western's Owner Operator program. The advertisement made representations about how much money he would make and how many miles he would run as an Owner Operator consistent with the Statements set forth in Paragraphs 58-59.

162.    Relying on those representations, Plaintiff Holmes applied for the program. He was notified by Western that he was approved and traveled to Nashville, Tennessee for a Lease Purchase class.

163.    During the Lease Purchase class, Joe Horn, the Director Lease Purchase at Western, told him that he would make at least $2,500 per week net, that he would be expected to pay $1,100 per week in expenses, that his truck would be in good condition, that he would be able to drive with a co- driver as a team without having to pay additional fees, and that he would be paid for every mile he drove.

164.    Plaintiff Holmes relied on Western's representations about the Owner Operator program in deciding to sign a Lease and Contract.

165.    In reliance upon Western's representations, Plaintiff Holmes signed a Lease and Contract on or about October 2018.

166.    Plaintiff Holmes was not allowed to negotiate any of the terms of the Lease or Contract, including who to lease the truck from. Plaintiff Holmes was required to lease a truck from New Horizons. Defendants told Plaintiff Holmes that he had to sign the documents immediately.

167.    Plaintiff Holmes did not make the money he was told he would make, he paid more in weekly expenses than he was told he would pay, his leased truck was not in good condition, Defendants charged him to bring on a co-driver, and Defendants did not pay him for every mile he drove.

168.    In some weeks for work, Plaintiff Holmes did not make any earnings at all, and was treated by Defendants as owing them money for the work he performed for their benefit.

169.    Plaintiff Holmes was never given a choice of loads, but was instead assigned a single load at a time that he was required to accept. If he did not accept the load, he would be forced to

33

"sit" without a load or he would be given a worse load.

170.    Defendants told Plaintiff Holmes that he could use his leased truck to haul for other companies, but when he tried to do it, Defendants made it effectively impossible. Defendants told Plaintiff Holmes that they were not in the business of leasing a truck to him to haul for another carrier

171.    To haul for another carrier, Plaintiff Holmes would have had to secure Defendants' approval of the other carrier, he would have had to pay Defendants a fee, he would have had to pay Defendants part of his earnings from hauling for the other carrier, and the other carrier would have to agree to pay Defendants directly. Plaintiff Holmes would also have had to take all of Defendants' signage off the truck and put the other carrier's signage on it.

I.    **Defendants' Actions Were Willful and Defendants' Unlawful Practices Were Widespread**

172.    Defendants' failure to pay Plaintiffs the proper wages required by law was willful.

173.    Defendants' unlawful conduct, as set forth in this Class Action Complaint, has been intentional, willful, and in bad faith, and has caused significant damages to Plaintiffs and the Class.

174.    Defendants were aware or should have been aware that the law required them to pay Plaintiffs and the Plaintiff Class members minimum wages for each workweek.

175.    Upon information and belief, Defendants apply the same unlawful policies and practices to the Plaintiffs in every state in which they operate.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(FEDERAL FAIR LABOR STANDARDS ACT)**

176.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs

34

177.    Defendants failed to pay minimum wages to Plaintiffs in violation of the Fair Labor

Standards Act, 29 U.S.C. § 201 et seq. and its implementing regulations.

178.    Defendants' failure to pay proper minimum wages for each hour worked per week was

willful within the meaning of the FLSA.

179.    Defendants' failure to comply with the FLSA minimum wage protections caused

Plaintiffs to suffer loss of wages and interest thereon.

**SECOND CAUSE OF ACTION**
**(TENNESSEE COMMON LAW FRAUD)**

180.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding

paragraphs.

181.    Defendants engaged in fraud in that (1) Defendants made a representation of a present or

past fact; (2) the representation was false when it was made; (3) the representation involved a

material fact; (4) Defendants either knew that the representation was false or did not believe it to

be true or that Defendants made the representation recklessly without knowing whether it was

true or false; (5) Plaintiffs did not know that the representation was false when made and were

justified in relying on the truth of the representation; and (6) Plaintiffs sustained damages as a

result of the representation.

182.    Characteristic examples of the specific false representations at issue are specifically set

forth above at Paragraphs 54 through 71, with respect to all class members, at Paragraphs 131

through 146, with respect to Plaintiff Elmy, at Paragraphs 147 through 159, with respect to

Plaintiff Biernot, and at Paragraphs 160 through 171, with respect to Plaintiff Holmes.

183.    The false representations were either identical or substantially similar in all material

respects from 2014 to present, regardless of whether the representations were published in

writing through Defendants' online electronic platforms, such as its website or Facebook, or

35

through oral representations made by Defendants' employees during the orientation for potential drivers immediately prior to their joining the Owner Operator program.

184.    As these representations were made at a minimum to Plaintiffs immediately prior to their agreeing to join the Owner Operator program, Plaintiffs relied on theses false representations in deciding to enter into the Contracts and Equipment Leases.

185.    Plaintiffs acted reasonably and in ignorance of the falsity of Defendants' representations and were thereby induced to act to their injury and damage.

186.    Defendants' fraud caused Plaintiffs to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

**THIRD CAUSE OF ACTION**
**(TENNESSEE COMMON LAW NEGLIGENT MISREPRESENTATION)**

187.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

188.    Defendants engaged in negligent representation by, in the course of their business, profession, or employment, or in any other transaction in which they had a pecuniary interest, supplying false information for the guidance of Plaintiffs in their business transactions, and by failing to exercise reasonable care or competence in obtaining or communicating the information to Plaintiffs.

189.    Characteristic examples of the specific representations at issue are specifically set forth above at Paragraphs 54 through 71, with respect to all class members, at Paragraphs 131 through 146, with respect to Plaintiff Elmy, at Paragraphs 147 through 159, with respect to Plaintiff Biernot, and at Paragraphs 160 through 171, with respect to Plaintiff Holmes.

190.    Defendants track operating statistics related to their fleet and compensation of their

drivers such that Defendants should have known that the specific representations they were making regarding driving earnings and miles driven by drivers were false and misleading.

191.    Defendants are subject to liability for pecuniary losses caused to Plaintiffs by Plaintiffs' justifiable reliance on the representations.

192.    Defendants' negligent misrepresentation caused Plaintiffs to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

**FOURTH CAUSE OF ACTION**
**(TENNESSEE COMMON LAW UNENFORCEABLE CONTRACT)**

193.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

194.    The Lease and Contract are unenforceable contracts under the Tennessee common law of contracts, as the provisions of the Agreements are unconscionable.

195.    The Lease and Contract are unconscionable because, among other things, they are presented to Plaintiffs on a "take-it-or-leave-it basis" with no opportunity for Plaintiffs to negotiate any of their terms, and because the terms are so oppressive that no reasonable person would make them and no honest and fair person would accept them.

196.    Defendants' unconscionable contracts are void and unenforceable.

**FIFTH CAUSE OF ACTION**
**(TENNESSEE COMMON LAW UNJUST ENRICHMENT)**

197.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

198.    No enforceable contract existed between Plaintiffs and Defendants because the Contracts and Equipment Leases were unconscionable under Tennessee common law, as set forth in Fourth

Cause of Action.

199.    No enforceable contract existed between Plaintiffs and Defendants because the Contracts and Equipment Leases were procured through fraud in the inducement and fraud in the factum, as set forth in the Second Cause of Action.

200.    Defendants were unjustly enriched by Plaintiffs as (1) Plaintiffs conferred benefits on Defendants; (2) Defendants appreciated such benefits; and (3) Defendants accepted and retained such benefits under such circumstances as to make it inequitable for Defendants to retain the benefits without payment of their value.

201.    Defendants' unjust enrichment caused Plaintiffs to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Defendants' Owner Operator program.

202.    Plaintiffs are entitled to restitution of all benefits conferred upon Defendants, including but not limited to, the disgorgement of any unjust profits.

## SIXTH CAUSE OF ACTION
## (FEDERAL FORCED LABOR)

203.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

204.    Defendants obtained the continuous labor of Plaintiffs by using threats of serious financial and professional harm.

205.    Defendants operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious financial and professional harm.

206.    Defendants threatened Plaintiffs that they would use the legal system, debt collection system, and DAC Reports to enforce the crushing debt that Defendants' Lease and Contract operation imposed on Plaintiffs.

38

207.    Defendants' scheme, plan or pattern caused Plaintiffs to engage in forced labor for

Defendants in violation of the federal forced labor statutes, 18 U.S.C. §§ 1589 and 1595.

### SEVENTH CAUSE OF ACTION
### (TRUTH IN LEASING ACT)

208.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding

paragraphs.

209.    The written Leases provided to Plaintiffs violate numerous provisions of the Truth in

Leasing Act, as set forth above.

210.    As a result of Defendants' conduct, Plaintiffs have suffered damages, including through

the retention of unlawfully withheld escrow monies, charges made for unlawful chargebacks, and

failure to provide compensation due under the contracts.

### EIGHTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

211.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding

paragraphs.

212.    Defendants failed to pay Plaintiffs the cents per mileage revenue specified in their

Contracts.

213.    Plaintiffs are entitled to the additional mileage revenue they were promised by

Defendants.

**WHEREFORE**, Plaintiffs request that this Court enter an Order:

    1.    With respect to the FLSA claims:

        a.    Approving this action as a collective action and directing that Notice be issued

            to all Class Members;

        b.    Declaring that Defendants violated the FLSA;

39

c. Declaring that Defendants' violations of the FLSA were willful;

d. Granting judgment to Plaintiffs and represented parties for their claims of unpaid wages as secured by the Fair Labor Standards Act, as well as an equal amount in liquidated damages and interest;

e. Awarding Plaintiffs and represented parties reasonable service awards; and

f. Awarding Plaintiffs and represented parties their reasonable attorneys' fees and costs of suit including expert fees and interest.

2. With respect to the fraud and negligent misrepresentation claims:

a. Certifying this action as a class action;

b. Designating the Named Plaintiffs as Class Representatives;

c. Designating the undersigned counsel as Class Counsel;

d. Declaring that Defendants engaged in fraud and negligent misrepresentation;

e. Granting judgment to Plaintiffs for their damages;

f. Granting judgment to Plaintiffs for punitive damages against Defendants;

g. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

h. Awarding Plaintiffs their reasonable attorneys' fees and costs of suit including expert fees and interest.

3. With respect to the claim that the Contracts at issue were unenforceable contracts of adhesion:

a. Certifying this action as a class action;

b. Designating the Named Plaintiffs as Class Representatives;

40

c. Designating the undersigned counsel as Class Counsel;

d. Declaring that the Lease and Contract are unconscionable and void;

e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order determining that the Contract is void, or voidable, or alternatively severing any unconscionable clauses and enjoining Defendants from continuing their unlawful practices as described herein;

f. Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

g. Awarding pre-judgment and post-judgment interest, as provided by law;

h. Granting such other legal and equitable relief as the Court may deem just and proper;

i. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j. Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

4. With respect to the unjust enrichment claims:

a. Certifying this action as a class action;

b. Designating the Named Plaintiffs as Class Representatives;

c. Designating the undersigned counsel as Class Counsel;

d. Awarding damages and restitution, including disgorgement of Defendants' profits;

e. Awarding pre-judgment and post-judgment interest, as provided by law;

41

  f. Granting such other legal and equitable relief as the Court may deem just and proper;

  g. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

  h. Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

5. With respect to the federal forced labor claims:

  a. Certifying this action as a class action;

  b. Designating the Named Plaintiffs as Class Representatives;

  c. Designating the undersigned counsel as Class Counsel;

  d. Entering a declaratory judgment that the practices complained of herein are unlawful;

  e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices as described herein;

  f. Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

  g. Awarding pre-judgment and post-judgment interest, as provided by law;

  h. Granting such other legal and equitable relief as the Court may deem just and proper;

  i. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

6.   With respect to the Truth in Leasing claims:

a.   Certifying this action as a class action;

b.   Designating the Named Plaintiffs as Class Representatives;

c.   Designating the undersigned counsel as Class Counsel;

d.   Entering a declaratory judgment that the practices complained of herein are unlawful;

e.   Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices as described herein;

f.   Awarding statutory, compensatory and punitive damages, liquidated damages, appropriate statutory penalties, and restitution;

g.   Awarding pre-judgment and post-judgment interest, as provided by law;

h.   Granting such other legal and equitable relief as the Court may deem just and proper;

i.   Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j.   Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

7.   With respect to the breach of contract claims:

a.   Certifying this action as a class action;

43

b. Designating the Named Plaintiffs as Class Representative;

c. Designating the undersigned counsel as Class Counsel;

d. Entering a declaratory judgment that the practices complained of herein are unlawful;

e. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not necessarily limited to an order enjoining Defendants from continuing their unlawful practices as described herein;

f. Awarding expectation damages, compensatory damages, and restitution;

g. Awarding pre-judgment and post-judgment interest, as provided by law;

h. Granting such other legal and equitable relief as the Court may deem just and proper;

i. Awarding Plaintiffs and other representative Plaintiffs reasonable service awards; and

j. Awarding attorneys' fees and costs of suit, including expert fees, interest, and costs.

Dated: June 12, 2020

Respectfully Submitted,

*/s/ Lesley Tse*
Lesley Tse
Michael J.D. Sweeney
**Getman, Sweeney & Dunn, PLLC**
260 Fair Street
Kingston, New York 12401
Telephone: (845) 255-9370
Fax: (845) 255-8649
Email: ltse@getmansweeney.com

44

Justin L. Swidler, Esq. (PA #205954)
**Swartz Swidler, LLC**
1101 Kings Hwy N., Ste 402
Cherry Hill, NJ 08034
Tel: (856) 685-7420
Fax: (856) 685-7417
Email: jswidler@swartz-legal.com

Charles Yezbak
**Yezbak Law Offices**
2002 Richard Jones Rd., Suite B-200
Nashville, Tennessee 37215
Telephone: (615) 250-2000
Email: yezbak@yezbaklaw.com

ATTORNEYS FOR PLAINTIFFS